# EXHIBIT 1

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, *ex rel.* KWAME RAOUL, Attorney General of the State of Illinois, | |
| Plaintiff, | |
| v. | |
| 3M COMPANY, DYNEON, L.L.C., ARKEMA, INC., AGC CHEMICALS AMERICAS INC., BASF CORPORATION, BAYER CORPORATION, CLARIANT CORPORATION, THE CHEMOURS COMPANY, THE CHEMOURS COMPANY FC, LLC, CORTEVA, INC., DOWDUPONT, INC., DUPONT DE NEMOURS, INC., E. I. DU PONT DE NEMOURS AND COMPANY, DAIKIN AMERICA, INC., and SOLVAY SPECIALTY POLYMERS, USA, LLC, | |
| Defendants. | |

## COMPLAINT

Plaintiff, People of the State of Illinois, *ex rel.* Kwame Raoul, Attorney General of the State of Illinois ("People" or the "State"), seeks to hold some of the largest chemical companies in the world accountable for their culpable conduct and to (1) recover natural resource damages and other monetary damages necessary for Illinois to continue identifying, monitoring, and remediating, where appropriate, contamination to Illinois' environment and natural resources from perfluoroalkyl and polyfluoroalkyl substances (a group of chemicals commonly referred to as "PFAS"); (2) obtain injunctive relief requiring Defendants to take action to prevent ongoing contamination, remediate the areas contaminated, and restore resources injured or impacted by

PFAS in the State of Illinois; (3) recover civil penalties for violations of Illinois statutes and regulations resulting from the PFAS contamination described herein; and (4) obtain any other equitable relief as appropriate.

**INTRODUCTION AND NATURE OF THE ACTION**

1.      Illinois, with a population of roughly 12.67 million people, is the sixth-largest state, by population, in the United States.

2.      Illinois is one of four states that border Lake Michigan.

3.      Lake Michigan is the second largest of the five Great Lakes by volume and the largest lake entirely within the United States.

4.      One of the largest aquifers in the United States, the Mahomet Aquifer, is located entirely within Illinois.

5.      Nearly the entirety of Illinois' western boundary is the Mississippi River, with the few exceptions being where the Mississippi River has changed course over time.

6.      The Mississippi River watershed is the fourth largest in the world, with an area of approximately 1.2 million square miles.

7.      Illinois has established itself as a leader in protecting the environment and in identifying, monitoring, and addressing contamination caused by PFAS in Illinois.

8.      The Illinois Environmental Protection Agency ("Illinois EPA") is an administrative agency of the State of Illinois, created pursuant to Section 4 of the Illinois Environmental Protection Act ("Act"), 415 ILCS 5/4 (2020), and charged, *inter alia*, with the duty of enforcing the Act.

9.      The Illinois Department of Natural Resources ("IDNR") is an administrative

2

agency of the State of Illinois, created by Section 1-5 of the Illinois Department of Natural Resources Act ("IDNR Act"), 20 ILCS 801/1-5 (2020), and charged, *inter alia*, with the duty of enforcing the Fish and Aquatic Life Code ("Fish Code"), 515 ILCS 5/5-5 (2020), and the Wildlife Code ("Wildlife Code"), 520 ILCS 5/1-10 (2020).

10.     The Illinois EPA and IDNR are Co-Trustees of the State of Illinois' Natural Resources.

11.     The ownership of and title to all wild birds and wild mammals within the jurisdiction of the State of Illinois are declared to be in the State of Illinois.  520 ILCS 5/2.1 (2020).

12.     The ownership of and title to all aquatic life within the boundaries of the State of Illinois are declared to be in the State of Illinois.  515 ILCS 5/5-5 (2020).

13.     PFAS are a group of synthetic chemicals that do not occur naturally in the environment and have been in use since the 1940s.[1]

14.     PFAS are toxic and harmful to the public health, safety, and welfare, and to the environment.

15.     For purposes of this Complaint, "PFAS" shall include, but not be limited to, the 18 PFAS that were subject to the State of Illinois' statewide investigation into the prevalence and occurrence of PFAS in finished water at 1,428 entry points to the distribution system representing 1,749 community water supplies ("CWSs") across Illinois, which Illinois EPA conducted from

---

[1] *EPA's Per- and Polyfluoroalkyl Substances (PFAS) Action Plan*, U.S. EPA (Feb. 2019) at 1, https://www.epa.gov/sites/default/files/2019-02/documents/pfas_action_plan_021319_508compliant_1.pdf; *PFAS Strategic Roadmap: EPA's Commitment to Action 2021-2024*, U.S. EPA (Oct. 2021) at 5, https://www.epa.gov/system/files/documents/2021-10/pfas-roadmap_final-508.pdf; *An Overview of Perfluoroalkyl and Polyfluoroalkyl Substances and Interim Guidance*, CENTERS FOR DISEASE CONTROL AND PREVENTION (May 7, 2018) at 1, https://stacks.cdc.gov/view/cdc/77114.

late 2020 to 2021.[2]  The 18 PFAS compounds include: Perfluorotetradecanoic acid ("PFTA"); Perfluorotridecanoic acid ("PFTrDA"); Perfluoroundecanoic acid ("PFUnA"); Perfluorodecanoic acid ("PFDA"); Perfluorododecanoic acid ("PFDoA"); Perfluorononanoic acid ("PFNA"); Perfluorooctanoic acid ("PFOA"); Perfluoroheptanoic acid ("PFHpA"); Perfluorohexanoic acid ("PFHxA"); Perfluorooctanesulfonic acid ("PFOS"); Perfluorohexanesulfonic acid ("PFHxS"); Perfluorobutanesulfonic acid ("PFBS"); N-ethyl perfluorooctanesulfonamidoacetic acid ("NEtFOSAA"); N-methyl perfluorooctanesulfonamidoacetic acid ("NMeFOSAA"); 2,3,3,3-tetrafluoro-2-(heptafluoropropoxy)propanoic acid ("HFPO-DA (GenX acid)"); 4,8-dioxa-3H-perfluorononanoic acid ("DONA (ADONA acid)"); 11-chloroeicosafluoro-3-oxaundecane-1-sulfonic acid ("11CI-PF3OUdS"); and 9-chlorohexadecafluoro-3-oxanone-1-sulfonic acid ("9CI-PF3ONS").

16.     There may be more than 5,000 different types of PFAS.  The list contained in the above paragraph is not a complete list of PFAS that are the subject of this Complaint.  With the exception noted below, the Complaint encompasses all the thousands of PFAS, known or unknown.  Plaintiff reserves its right to identify additional PFAS through discovery and as the science and research on the emerging PFAS crisis develops.

17.     PFAS as defined in this Complaint do *not* include any PFAS that have contaminated Illinois' environment or natural resources from aqueous film-forming foams ("AFFF") containing PFOA, PFOS, or any other PFAS compound.  Through this action, the People are not seeking

---

[2] *See PFAS Statewide Investigation Network: Community Water Supply Sampling*, ILLINOIS ENV'T PROT. AGENCY,  https://www2.illinois.gov/epa/topics/water-quality/pfas/Pages/pfas-statewide-investigation-network.aspx.

damages, remediation, restoration, or any other relief with respect to any contamination related to AFFF.

18.     While certain natural resources in Illinois may be contaminated by PFAS from AFFF, such contamination is separable from PFAS contamination caused by consumer, industrial, and other non-AFFF sources.

19.     This matter does _not_ involve any PFAS contamination at issue in the matter of _People v. 3M_, No. 22-cv-4075, Central District of Illinois, Rock Island Division.

20.     PFAS are found in a wide array of consumer and industrial products.[3]

21.     In 2019, it came to light that "[c]ompanies such as 3M and DuPont, which used PFAS to make household products that Americans used in their homes every day like Teflon and Scotch Guard, knew for decades that these chemicals were toxic."[4]

22.     Defendants have consistently and publicly denied that PFAS present any harm to human health or the environment.

23.     As of the date of the filing of this Complaint, a website sponsored by Defendant 3M asserts that "the weight of scientific evidence does not show that PFOS or PFOA causes harm to the environment or people at current or historical levels."[5]

---

[3] _EPA's Per- and Polyfluoroalkyl Substances (PFAS) Action Plan_, _supra_ note 1 at 1.
[4] _The Devil They Knew: PFAS Contamination and the Need for Corporate Accountability, Hearing Before the Subcommittee on Environment of the Committee on Oversight and Reform_, 116th Congress 1 (2019) (statement of Rep. Rouda, chairman of the subcommittee) at 2, https://docs.house.gov/meetings/GO/GO28/20190724/109847/HHRG-116-GO28-Transcript-20190724.pdf.
[5] _The Facts on PFAS_, PFAS FACTS, https://www.pfasfacts.com/ (last visited Jan. 19, 2023).

24.     As of the date of the filing of this complaint, a website sponsored by Defendant Chemours asserts that "[f]luoropolymers do not pose a significant risk to human health or the environment when used for their intended purpose."[6]

25.     As of the date of the filing of this complaint, a website sponsored by Defendant Daikin asserts that "[a]ll PFAS that Daikin produces or uses in manufacturing have been reviewed and approved for health and safety by agencies such as the US Environmental Protection Agency (EPA) and the Food & Drug Administration."[7]

26.     Contrary to Defendants' assertions, the U.S. Environmental Protection Agency ("U.S. EPA") has concluded that human epidemiology data identifies associations between certain PFAS exposure and high cholesterol, increased liver enzymes, decreased vaccination response, thyroid disorders, pregnancy-induced hypertension and preeclampsia, and cancer (testicular and kidney).

27.     Defendants comprise the limited number of companies that have manufactured PFAS as defined herein.

28.     Defendants have manufactured PFAS and PFAS-containing products, which were sold into the State of Illinois for use in industrial processes and as consumer goods.  By manufacturing and sending into Illinois these chemicals while misleading the public about their toxic properties, Defendants have caused widespread contamination and injuries to Illinois' natural resources and have caused releases of PFAS into the environment at concentrations that exceed

_____

[6] *Chemours Commitment to Responsible Chemistry*, CHEMOURS https://www.chemours.com/en/corporate-responsibility/sustainability-safety/our-commitment-to-pfas-stewardship#:~:text=Fluoropolymers %20do%20not%20pose%20a,environment%20and%20do%20not%20degrade (last visited Jan. 19, 2023).
[7] *Measures Concerning Environmental Emissions of PFAS*, DAIKIN, https://www.daikinchemicals. com/company/sustainability/pfas.html (last visited Jan. 19, 2023).

applicable Illinois Health Advisories (which contain health-based guidance levels for PFAS), and which cause or tend to cause pollution in the State of Illinois.

29.    Article XI of the Illinois Constitution, Ill. Const. Article XI, § 2, provides that, "[e]ach person has the right to a healthful environment.  Each person may enforce this right against any party, governmental or private, through appropriate legal proceedings subject to reasonable limitation and regulation as the General Assembly may provide by law."

30.    The People bring this action in the public interest of the citizens of the State of Illinois against Defendants pursuant to Illinois' common laws of negligence, trespass, public nuisance, unjust enrichment, strict products liability, and civil conspiracy, as well as the Illinois Fish Code, 515 ILCS 5/1-1 *et seq*. (2020); the Illinois Wildlife Code, 520 ILCS 5/1.1 *et seq*. (2020); the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq*. (2020); and the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1 *et seq*. (2020).

## PARTIES

**Plaintiff.**

31.    Plaintiff is the People of the State of Illinois, *ex rel.* Kwame Raoul, Attorney General of the State of Illinois ("People" or the "State").

32.    The State maintains principal offices at 500 South Second Street Springfield, Illinois 62701 and 100 West Randolph Street, Chicago, Illinois 60601.

33.    The Attorney General is the chief legal officer of the State of Illinois, having the powers and duties prescribed by law in Ill. Const. Article V, § 15.

34.    The Attorney General has statutory and common law authority to appear on behalf of the People of the State of Illinois in all cases in which the State or the People of the State are

7

interested.  *See, e.g.*, 15 ILCS 205/4 (2020); *People ex rel. Scott v. Briceland*, 65 Ill. 2d 485, 494 (1976).

35.     The "Attorney General has an obligation to represent the interests of the People so as to ensure a healthful environment for all the citizens of the State."  *People v. NL Indus.*, 152 Ill. 2d 82, 103 (1992), *opinion modified on denial of reh'g* (Nov. 30, 1992).

36.     The Illinois Attorney General is "the only officer empowered to represent the State in litigation in which it is the real party in interest."  *Fuchs v. Bidwill*, 65 Ill. 2d 503, 510 (1976).

37.     The Illinois Attorney General has *parens patriae* power to represent the interests of the People so as to protect the State's natural resources and ensure a healthful environment for all the residents of the State.

38.     The State of Illinois has a quasi-sovereign interest in and obligations as public trustee to protect its natural resources, including air, soils, and lands, aquatic and submerged lands, waters, aquifers, wildlife, fish, shellfish, biota, and other natural resources.  The State further has a proprietary interest in protecting all property owned by the State and has an interest in remediating the contamination of its property and preventing future contamination.

39.     The Illinois Attorney General is authorized to enforce the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/7(a).

**Defendants.**

40.    Defendants comprise a small number of companies that caused and/or contributed to PFAS contamination to Illinois' environment and natural resources.

41.    Defendant 3M Company ("3M") is a Delaware corporation with its principal place of business at 3M Center, St. Paul, Minnesota 55144.

42.    3M conducts business throughout the United States, including in the State of Illinois.

43.    Upon information and belief, PFAS manufactured by 3M have contaminated Illinois' environment and natural resources.

44.    3M is registered to do business in Illinois and may be served with process through its registered agent, Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

45.    Defendant Dyneon, L.L.C. ("Dyneon") was a limited liability company organized and existing under the laws of the State of Delaware and a wholly owned subsidiary of 3M.

46.    Dyneon is now part of 3M and maintains its principal place of business at 3M Center Building 224-5N-40, St. Paul, Minnesota 55144.

47.    Dyneon conducts business throughout the United States, including in the State of Illinois.

48.    Upon information and belief, PFAS manufactured by Dyneon have contaminated Illinois' environment and natural resources.

49.    Dyneon may be served with process through its registered agent, CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

9

50.     Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation with its principal place of business at 900 First Avenue, King of Prussia, Pennsylvania 19406.

51.     Arkema conducts business throughout the United States, including in the State Illinois.

52.     Arkema is a successor in interest to Atochem North American, Inc., Elf Atochem North America, Inc., and Atofina Chemicals, Inc.

53.     Upon information and belief, PFAS manufactured by Arkema have contaminated Illinois' environment and natural resources.

54.     Arkema is registered to do business in Illinois and may be served with process through its registered agent, Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

55.     Defendant AGC Chemicals Americas, Inc. f/k/a Asahi Glass Fluoropolymers USA, Inc. and AGA Chemicals, Inc. ("AGCCA"), is a Delaware corporation with its principal place of business at 55 East Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341.

56.     AGCCA conducts business throughout the United States, including in the State Illinois.

57.     Upon information and belief, PFAS manufactured by AGCCA have contaminated Illinois' environment and natural resources.

58.     AGCCA is registered to do business in Illinois and may be served with process through its registered agent, CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

59.     Defendant BASF Corporation ("BASF") is a Delaware corporation with its principal place of business located at 100 Park Avenue, Florham Park, New Jersey 07932.

60.     BASF conducts business throughout the United States, including in the State of Illinois.

61.     In 2009, BASF acquired Ciba Specialty Chemicals Inc. and certain legacy fluorochemical product lines.

62.     Upon information and belief, PFAS manufactured by BASF have contaminated Illinois' environment and natural resources.

63.     BASF is registered to do business in Illinois and may be served with process through its registered agent, CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

64.     Defendant Bayer Corporation ("Bayer") is an Indiana corporation with its principal place of business located at 100 Bayer Boulevard, Whippany, NJ 07981.

65.     Bayer conducts business throughout the United States, including at multiple locations in the State of Illinois.

66.     Upon information and belief, PFAS manufactured by Bayer have contaminated Illinois' environment and natural resources.

67.     Bayer is registered to do business in Illinois and may be served with process through its registered agent, Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

68.     Defendant Clariant Corporation ("Clariant") is a New York corporation with its principal place of business located at 500 East Morehead Street, Suite 400, Charlotte, North Carolina 28202.

69.     Clariant conducts business throughout the United States, including in the State of Illinois.

11

70.     Clariant is registered to do business in Illinois and may be served with process through its registered agent, Illinois Corporation Service Company, at 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

71.     Upon information and belief, PFAS manufactured by Clariant have contaminated Illinois' environment and natural resources.

72.     Defendant Daikin America, Inc. ("Daikin") is a Delaware corporation with its principal place of business at 20 Olympic Drive, Orangeburg, New York 10962.

73.     Daikin conducts business throughout the United States, including in the State of Illinois.

74.     Upon information and belief, PFAS manufactured by Daikin have contaminated Illinois' environment and natural resources.

75.     Daikin is registered to do business in Illinois and may be served with process through its registered agent, CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

76.     Defendant E.I. du Pont de Nemours and Company ("Historical DuPont") is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805.

77.     Historical DuPont conducts or has conducted business throughout the United States, including in the State of Illinois.

78.     Historical DuPont is registered to do business in Illinois and may be served with process through its registered agent, CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

79.     Defendant The Chemours Company is a Delaware corporation with its principal place of business at 1007 Market Street, Wilmington, Delaware 19899.

80.     The Chemours Company was incorporated as a subsidiary of Historical DuPont as of April 30, 2015.

81.     From April 30, 2015, until July 2015, The Chemours Company was a wholly owned subsidiary of Historical DuPont.

82.     In July 2015, Historical DuPont spun off The Chemours Company and transferred to The Chemours Company its "performance chemicals" business line, which includes its fluoroproducts business, and distributed shares of The Chemours Company stock to Historical DuPont stockholders.

83.     The Chemours Company has since been an independent, publicly traded company.

84.     The Chemours Company conducts business throughout the United States, including in the State of Illinois.

85.     The Chemours Company is registered to do business in Illinois and may be served with process through its registered agent, CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

86.     Defendant The Chemours Company FC, LLC is a Delaware corporation with its principal place of business at 1007 Market Street, Wilmington, Delaware 19899.

87.     The Chemours Company FC, LLC operates as a subsidiary of The Chemours Company and manufactures fluoropolymer resins.

88.     The Chemours Company FC, LLC conducts business throughout the United States, including in the State of Illinois.

13

89.     The Chemours Company FC, LLC is registered to do business in Illinois and may be served with process through its registered agent, CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

90.     The Chemours Company and The Chemours Company FC, LLC are collectively referred to throughout this Complaint as "Chemours."

91.     Defendant DowDuPont, Inc. ("DowDuPont") is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805.

92.     Historical DuPont merged with The Dow Chemical Company in August 2017 to create DowDuPont.

93.     Historical DuPont and The Dow Chemical Company each merged with wholly owned subsidiaries of DowDuPont and, as a result, became subsidiaries of DowDuPont.  Since the time of the merger, DowDuPont has effected a series of separation transactions to separate its businesses into three independent, publicly-traded companies for each of its agriculture, materials science, and specialty products businesses, discussed herein.

94.     Defendant Corteva, Inc. ("Corteva") is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805.

95.     Corteva was initially formed in February 2018.

96.     From February 2018 until June 1, 2019, Corteva was a wholly owned subsidiary of DowDuPont.

97.     On June 1, 2019, DowDuPont separated its agriculture business by spinning it off into Corteva.

98.     On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva common stock by way of a *pro rata* dividend.

14

99. Following the June 1, 2019, stock distribution, Corteva became (and remains) the direct parent of Historical DuPont and holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

100. Corteva, Inc. conducts business throughout the United States, including in the State of Illinois.

101. Corteva is registered to do business in Illinois and may be served with process through its registered agent CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

102. On June 1, 2019, DowDuPont, the surviving entity after the spinoff of Corteva and of another entity known as Dow Inc., changed its name to DuPont de Nemours, Inc.

103. DuPont de Nemours, Inc. retained assets in the specialty products business lines following the above-described spinoffs, as well as the balance of the financial assets and liabilities of Historical DuPont not assumed by Corteva, Inc.

104. Defendant DuPont de Nemours, Inc. (f/k/a DowDuPont Inc.) ("New DuPont") is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805.

105. New DuPont conducts business throughout the United States, including in the State of Illinois.

106. New DuPont may be served with process through its registered agent CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

107. Historical DuPont, Chemours, Corteva, and New DuPont are collectively referred to as "DuPont" throughout this Complaint.

15

108.   DuPont conducts business throughout the United States, including at multiple locations in the State of Illinois.

109.   Upon information and belief, PFAS manufactured by DuPont have contaminated Illinois' environment and natural resources.

110.   Defendant Solvay Specialty Polymers, USA, LLC ("Solvay") is a Delaware corporation with its principal place of business at 4500 McGinnis Ferry Road, Alpharetta, Georgia 30004.

111.   Solvay conducts business throughout the United States, including at multiple locations in the State of Illinois.

112.   Upon information and belief, PFAS manufactured by Solvay have contaminated Illinois' environment and natural resources.

113.   Solvay is registered to do business in Illinois and may be served with process through its registered agent, Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

114.   All Defendants: (a) have designed, marketed, developed, distributed, sold, manufactured, released, supplied, transported, arranged for disposal or treatment of, handled, and/or used PFAS and/or PFAS-containing products in Illinois such that PFAS and PFAS-containing products have contaminated and threatened the State's natural resources and property; (b) acted with actual or constructive knowledge that PFAS and PFAS-containing products would be delivered into areas affecting the State's natural resources and property; (c) are legally responsible for and committed each of the wrongful acts alleged in this Complaint; and (d) promoted PFAS and PFAS-containing products, despite the availability of reasonable alternatives

and their actual or constructive knowledge that the contamination alleged in this Complaint would be the inevitable result of their conduct.

115.     This conduct has caused past and ongoing injury to Illinois' natural resources, environment, public heath, and welfare.

116.     To the extent any act or omission of any Defendant is alleged in this Complaint, the officers, directors, agents, employees, or representatives of each such Defendant committed or authorized each such act or omission or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of such Defendants, and did so while acting within the scope of their duties, employment, or agency.

117.     Any references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants.

## JURISDICTION AND VENUE

118.     This Court has jurisdiction over the subject matter of this action pursuant to Article VI, Section 9 of the Illinois Constitution, ILL. CONST. ARTICLE VI, § 9.

119.     Jurisdiction is proper pursuant to 735 ILCS 5/2-209 (2020) because Defendants, at all relevant times: (i) transacted business in Illinois, (ii) committed tortious actions within Illinois; (iii) owned, used, or possessed real estate within the state of Illinois; and/or (iv) made or performed a contract or promise substantially connected with this State.  *See* 735 ILCS 5/2-209.

120.     Venue is proper pursuant to 735 ILCS 5/2-101 because the transactions or some part thereof out of which the causes of action at issue in this Complaint arose in Cook County.

121.     Defendants' connections with the State of Illinois are consistent with the requirements of the Due Process Clause of the Fourteenth Amendment given that Defendants have purposefully availed themselves of the privilege of conducting activities in Illinois, the causes of action arise from the Defendants' activities in Illinois, and Defendants' activities are so substantially connected to Illinois to make the exercise of jurisdiction over Defendants reasonable.

## FACTUAL ALLEGATIONS

### I.      PFAS are toxic and pose substantial health and environmental risks.

122.     PFAS are a family of chemical compounds containing strong carbon-fluorine bonds.[8]

123.     PFAS have been used for decades in a wide array of consumer and industrial products.[9]

124.     Among thousands of other uses, PFAS may be used to keep food from sticking to cookware, to make sofas and carpets resistant to stains, to make clothes and mattresses more waterproof, and to make some food packaging resistant to grease absorption.[10]

125.     Because PFAS help reduce friction, they are also used in a variety of other industries, including aerospace, automotive, building and construction, and electronics.[11]

---

[8] *EPA's Per- and Polyfluoroalkyl Substances (PFAS) Action Plan*, *supra* note 1, at 9.
[9] *Id.* at 1; *see also PFAS Strategic Roadmap*, *supra* note 1, at 5.
[10] *See Per- and Polyfluoroalkyl Substances (PFAS)*, U.S. DEP'T OF HEALTH AND HUMAN SERVICES (Aug. 3, 2021), https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index.html?utm_source=direct&utm_medium=prod&utm_campaign=ntpgolinks&utm_term=pfas.
[11] *An Overview of Perfluoroalkyl and Polyfluoroalkyl Substances and Interim Guidance*, *supra* note 1, at 1.

126. PFAS are human-made, synthetic chemicals that do not exist naturally in the environment.[12]

127. Known pathways for PFAS to enter the environment include releases to air, land, surface water and groundwater from industrial processes and facilities, from disposal by industrial processes and facilities, and from the normal use and/or disposal of consumer products that contain PFAS.[13]

128. PFAS are known as "forever" chemicals because they are extremely persistent in the environment and resistant to typical environmental degradation processes.[14]

129. The persistence of PFAS and their resistance to biodegradation leads to their accumulation in the environment.[15]

130. PFAS behave differently depending on their makeup, but generally absorb poorly and tend to be mobile in soil and groundwater systems.

131. This combination of properties enables PFAS to readily migrate in soil, groundwater, and surface water.[16]

---

[12] *See, e.g.*, *EPA's Per- and Polyfluoroalkyl Substances (PFAS) Action Plan*, *supra* note 1, at 1; *see also PFAS Strategic Roadmap*, *supra* note 1, at 6.

[13] *See Per- and Polyfluoroalkyl Substances (PFAS)*, ILLINOIS ENV'T PROT. AGENCY https://www2.illinois.gov/epa/topics/water-quality/pfas/Pages/default.aspx (last visited Jan. 19, 2023).

[14] *See* Keith Matheny, *Internal Documents Show 3M Hid PFAS Dangers for Decades*, DETROIT FREE PRESS (May 9, 2019), https://www.freep.com/story/news/local/michigan/2019/05/09/3-m-lawsuit-pfas-water-contamination-michigan/3291156002/.

[15] *See EPA's Per- and Polyfluoroalkyl Substances (PFAS) Action Plan*, *supra* note 1, at 9

[16] John A. Simon, *Editor's perspective – Per- and polyfluorinated substances pose substantial challenges to remediation practitioners*, 28 THE JOURNAL OF ENV'T CLEANUP COSTS, TECHNOLOGIES, AND TECHNIQUES 3, 3-7 (2018), https://onlinelibrary.wiley.com/doi/full/10.1002/rem.21547.

132.    The pernicious characteristics of PFAS mean that once these chemicals are released into the environment, they tend to migrate into and can cause extensive contamination and injury to the State's environment, natural resources, and property.[17]

133.    Humans are exposed to PFAS through ingestion of contaminated drinking water and food, inhalation, dermal contact, and other pathways.[18]

134.    PFAS bioaccumulate in humans, animals, and plants, and can bio-magnify in humans and animals that consume plants, dairy, and meat contaminated with PFAS.[19]

135.    PFAS can even be found in the blood of human infants.[20]

136.    Breast milk appears to be a source of PFAS exposure.[21]

137.    Chronic exposure to PFAS at low doses can result in adverse health effects for humans as well as animals.[22]

138.    Exposure to PFAS is correlated with a wide array of harmful and serious health effects in humans and animals, including but not limited to:

      (a) Liver damage;

      (b) Altered cholesterol levels;

      (c) Pregnancy-induced hypertension and/or preeclampsia;

      (d) Thyroid disease;

---

[17] *See generally id.*

[18] *See EPA's Per- and Polyfluoroalkyl Substances (PFAS) Action Plan*, *supra* note 1.

[19] *See, e.g.*, *Per- and Polyfluorinated Substances (PFAS) Factsheet*, CENTERS FOR DISEASE CONTROL AND PREVENTION (May 2, 2022), https://www.cdc.gov/biomonitoring/PFAS_FactSheet.html#:~:text= Many%20PFAS%2C%20including%20perfluorooctane%20sulfonic,bioaccumulate)%20in%20fish%20an d%20wildlife.

[20] *See Toxicological Profile for Perfluoroalkyls*, U.S. DEP'T OF HEALTH AND HUMAN SERVICES, AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY (May 2021), https://www.atsdr.cdc.gov/toxprofiles /tp200.pdf.

[21] *Id.*

[22] *Id.*

(e) Modulation of the immune system;

(f) Decreased fertility; and

(g) Decreases in birth weight.[23]

139.    The U.S. EPA has classified PFOA and PFOS as having suggestive evidence of carcinogenic potential in humans, specifically for testicular, kidney, and liver cancer.

140.    PFAS contamination is a serious threat to human health and the State's natural resources and property.

## II.    Defendants manufactured and used PFAS with full knowledge of the chemicals' toxicity and the health and environmental risks posed by the chemicals.

141.    Defendants have known for decades that PFAS are toxic and pose substantial health and environmental risks.

142.    As early as the 1950s, 3M's internal animal studies found that PFAS are "toxic," and this finding was confirmed in further studies throughout the late 1970s and 1980s.[24]

143.    By the 1960s, 3M knew that perfluorochemicals, a subgroup of PFAS, are stable, persist in the environment, and do not degrade.[25]

144.    As early as 1961, DuPont company scientists issued internal warnings regarding PFOA's toxicity.  The DuPont Toxicology Section Chief stated that PFOA should be "handled with extreme care."[26]

---

[23] *See id.*

[24] Lori Swanson, *Former Attorney General of Minnesota Testimony Before the Committee on Oversight and Reform, Subcommittee on Environment, United States House of Representatives* (Sept. 10, 2019), at 3-4, https://www.congress.gov/116/meeting/house/109902/witnesses/HHRG-116-GO28-Wstate-SwansonL-20190910.pdf (hereinafter referred to as "Swanson Testimony").

[25] Swanson Testimony, at Exhibit K.

[26] Envtl. Working Group, *TSCA 8(e) Petition to U.S. EPA*, https://www.ewg.org/news-insights/official-correspondence/ewg-tsca-8e-petition-us-epa (last visited Jan. 19, 2023) .

145.    3M conducted studies in the 1970s that confirmed PFOS is toxic to a variety of aquatic wildlife, including various fish species and aquatic invertebrates.

146.    In 1975, Dr. Warren Guy and Dr. Donald Taves, two independent scientists, found PFAS in human blood banks across the country and contacted 3M to inform them that they thought 3M chemicals might be to blame and to inquire whether fluorocarbon carboxylic acids were present in items in use by the public, like Scotchgard.[27]

147.    A 3M memorandum documenting the 1975 communication from Drs. Guy and Taves noted that 3M "plead ignorance" and refused to identify the chemicals in Scotchgard.[28]

148.    3M conducted its own study like the study performed by Drs. Guy and Taves and confirmed that PFAS were present in human blood.[29]

149.    3M conducted multiple studies throughout 1975 and 1976 that confirmed the presence of PFAS in blood of the workers who handled PFAS at levels between 50 to 1000 times higher than "normal" levels.[30]

150.    Despite this, in 1976, 3M lawyers urged 3M not to reveal that the "true identity" of the chemical in the blood was PFOS.[31]

151.    DuPont was also aware by 1976 that there were research reports that detected organic fluorine in United States' blood bank samples.

---

[27] Swanson Testimony, at Exhibit D.
[28] *Id.*
[29] Swanson Testimony, at Exhibit E.
[30] Swanson Testimony, at Exhibit F.
[31] *Id.*

152.    In 1978, DuPont initiated plans to review and monitor its employees who were exposed to PFOA, a chemical included in PFAS.  DuPont obtained blood samples from workers to assess whether they contained organic fluorine.

153.    By 1979, DuPont's data indicated its workers exposed to PFOA had a significantly higher incidence of health issues, including abnormal liver function, compared to workers who were not exposed to PFOA.

154.    By 1980, DuPont internally confirmed that PFOA "is toxic," that "people accumulate [PFOA]," and "continued exposure is not tolerable."[32]

155.    In 1980, 3M developed an internal memorandum entitled "Some Probable Questions on 3M Fluorochemicals with Suggested Answers" outlining responses that were presumably provided to customers and other concerned individuals who inquired about the safety of 3M's fluorochemical-containing products.[33]   This memorandum contained the following questions and answers:

- Q: "What precautions should we convey to our customers using Scotchgard treated carpet/fabric/garments?"

    o   A: "None."

- Q: "Is there any danger associated with handling, wearing, sitting on or crawling on fabrics/carpets treated with Scotchgard?"

---

[32] Shannon Lerner, *The Teflon Toxin*, THE INTERCEPT (Aug. 11, 2015), https://theintercept.com/2015/08/11/dupont-chemistry-deception/.

[33] Plaintiff's Motion to Compel Defendant 3M Company's Production of Custodial File of Lewis Lehr, *In re Aqueous Film-Forming Foam Products Liability Litigation*, No. 2:18-mn-02873 (D.S.C. Feb. 15, 2022), ECF No. 2174.

- A: "Consumers do not face any health threat, on the basis of information known at this time."

- Q: "My two-year-old son was in the room when I used 3 cans of Scotchgard aerosol to spray my couch. I heard about fluorochemicals in the blood and in your product. Must I be concerned that my child may now have fluorochemicals in his blood? What should I do?

  - A: "Should not be concerned."

- Q: "I am a physician. I have a patient in our emergency ward who had just swallowed Light Water FC-XXX Concentrate. Should I induce vomiting?"

  - A: "No."

- Q: "Are there any special concerns about disposing of process wastes. What procedures do you recommend for waste disposal?"

  - A: "…3M normally recommends discharging these solutions to waste water treatment systems. Fluorochemicals so disposed may be removed to some extent by being adsorbed in the sewage sludge, particularly if they have low water solubility. But, water soluble fluorochemicals may pass through the treatment system undegraded, For most fluorochemicals, such a passage is of negligible concern because of their low toxicity…"

156.    DuPont continued to conduct research on PFOA's toxicity to humans and animals in the 1980s. In 1985 and 1986, scientists from DuPont's Haskell Laboratory for Toxicology and Industrial Medicine published two studies on PFOA's toxicity. One study noted that PFOA was "moderately toxic" and produced "an increase in liver size and corneal capacity" in rats exposed

by inhalation to PFOA, while the other found skin irritation in rats and rabbits and increased liver size in rates based on PFOA's dermal toxicity.

157.    By 1988, DuPont was also aware of another rat toxicity study that demonstrated a relationship between PFOA exposure and certain increased cancer rates, including testicular cancer.

158.    In 1988, DuPont classified PFOA as a possible human carcinogen.

159.    By the late 1980s, 3M employees were questioning 3M's advertisement that PFAS chemicals were biodegradable.

160.    In a December 1988 email, a 3M employee sent an email to other 3M employees stating "I don't think it is in 3M's long-term interest to perpetuate the myth that these fluorochemical surfactants are biodegradable.  It is probable that this misconception will eventually be discovered, and when that happened, 3M will likely be embarrassed, and we and our customers may be fined and forced to immediately withdraw products from the market."[34]

161.    By 1993, 3M was aware that there was some evidence that lactating goats transferred PFAS to their kids in milk and it was likely that a similar phenomenon would occur in human mothers.[35]

162.    In 1997, 3M provided DuPont with a Material Safety Data Sheet for FC-118 Fluorad Brand Fluorochemical Surfactant, which included a warning that stated: "CANCER: WARNING: Contains a chemical which can cause cancer. (3825-26-1) (1983 and 1993 studies conducted jointly by 3M and DuPont)."[36]

---

[34] Swanson Testimony, at Exhibit H.
[35] *Id.*
[36] *Swanson Testimony*, at Exhibit A.

163.    3825-26-1 is the Chemical Abstract Services Registry Number ("CASRN") for Pentadecafluorooctanoic acid ammonium salt, which is a chemical form of PFOA.

164.    In 1998, a 3M scientist, Dr. Richard Purdy conducted a risk assessment of potential adverse effects on marine mammals from PFOS in the food chain and informed 3M of his findings that there was a significant risk of harm of food chain transfer, and that "the levels we are seeing in eagles and other biota is likely to climb each year."[37]

165.    Defendants are aware that short-chain PFAS (which include the compound known as GenX) have been found in human blood.

166.    Recent scientific studies have indicated that "short-chain PFAS are more widely detected, more persistent and mobile in aquatic systems, and thus may pose broader risks to human and ecosystem health."[38]

167.    At least one short-chain PFAS has been found to cause the same triad of tumors (Leydig (testicular), liver, and pancreatic) in a chronic rat cancer study as had been found in a chronic rat cancer study with a non-short-chain PFAS.

168.    Research and testing performed by and/or on behalf of Defendants that make and/or use short-chain PFAS indicates that such short-chain PFAS present the same, similar, and/or additional risks to human health, including risk of cancer.

---

[37] Richard E. Purdy, *Email to Georjean Adams re: Risk to the environment due to the presence of PFOS* (Dec. 3, 1998, 11:53 AM), https://static.ewg.org/reports/2019/pfa-timeline/1998_Food-Chain.pdf.

[38] *See* Fan Li, *et al.*, *Short-chain per- and polyfluoroalkyl substances in aquatic systems: Occurrence, impacts and treatment*, 380 CHEMICAL ENGINEERING JOURNAL 1 (2020), https://www.sciencedirect.com/science/article/abs/pii/S1385894719319096.

### III.    Defendants intentionally hid from Illinois and the public their knowledge of PFAS' toxicity and environmental and health risks.

169.    Despite their explicit knowledge of the dangers of PFAS, Defendants deliberately and intentionally concealed the dangers of PFAS from governmental entities, including the State of Illinois, its agencies, and the public at large, to protect profits and avoid public responsibility for injuries and damages caused by their toxic products.

170.    Defendants "neglected to tell people what was in those products and suppressed the scientific evidence that these chemicals were hazardous."[39]

171.    More troubling, Defendants actively engaged in a campaign to promote perfluorochemicals as safe to manufacture and use and to distort scientific evidence concerning potential harms associated with perfluorochemicals.

172.    As early as 1978, DuPont's Medical Director authorized and published an article acknowledging that DuPont had "a duty to report health hazards" and "should disclose health-hazard information" and that laying "all the facts on the table" was "the only responsible and ethical way to go" because "[t]o do less would be . . . morally irresponsible."[40]

173.    DuPont held a meeting at its corporate headquarters in Wilmington, Delaware in 1984 to discuss PFOA and its health and environmental issues.  During the meeting, DuPont discussed its "incremental liability from this point on if [they] do nothing as [they] are already liable for the past 32 years of operation" and that "legal and medical will likely take the position

---

[39] *The Devil They Knew*, *supra* note 4.
[40] *The Teflon Toxin*, *supra* note 32.

of total elimination" of PFOA. DuPont did not disclose any information to U.S. EPA, any state government, or the public about the information discussed at this meeting.[41]

174.    3M hired Dr. John P. Giesy, a professor and academic journal editor who reviewed several studies of chemicals before they were published and paid him a considerable amount of money in exchange for his services.[42]

175.    Dr. Giesy would share manuscripts of potentially harmful studies with 3M before they were published and advised 3M to "keep 'bad' papers out of the literature otherwise in litigation situations they can be a large obstacle to refute."[43]

176.    Dr. Giesy informed 3M that he made sure his timesheets were written in a way so that "there was no paper trail to 3M."[44]

177.    In 1999, the 3M scientist who conducted the study about movement of PFAS through the food chain, Dr. Richard Purdy, was so outraged by 3M's actions related to PFAS that he resigned in protest and copied U.S. EPA on his resignation letter stating that he could "no longer participate" in a 3M process that put "markets, legal defensibility and image over environmental safety."[45]

178.    Dr. Purdy further stated in his letter that "[p]erfluorooctanesulfonate is the most insidious pollutant since PCB. It is probably more damaging than PCB because it does not degrade."[46]

---

[41] *C-8 Meeting Summary 5/22/84 – Wilmington*, DUPONT, https://static.ewg.org/files/dupont_elim_PFOA_1984.pdf?_ga=2.245878788.1076188668.1630336086-433698119.1624027052 (last visited Jan. 19, 2023).
[42] Swanson Testimony, at Exhibit I.
[43] *Id.*
[44] *Id.*
[45] Swanson Testimony, at Exhibit B.
[46] *Id.*

179.    Dr. Purdy further stated in his letter that "3M continues to make and sell these chemicals though the company knows of an ecological risk assessment [he] did that indicates there is a better than 100% probability that perfluorooctanesulfonate is biomagnifying in the food chain and harming sea mammals . . . 3M told those of us working on the fluorochemical project not to write down our thoughts or have email discussions on issues because of how our speculations could be viewed in a legal discovery process."

180.    3M made specific statements about the safety of its most popular PFAS-containing products, such as Scotchgard, in numerous public documents.

181.    In May 2000, 3M's Corporate Medical Director Larry Zobel was quoted in a *Washington Post* article about the discontinuation of Scotchgard, stating that "[t]here have been no health effects in our employee population.  People should know that these workers have no health effects related to these materials - that is the bottom line of 30 years of medical monitoring."[47]

182.    3M issued a press release on May 16, 2000, which was distributed directly to Illinois companies that had been using 3M's Scotchgard products and 3M's Fluorad surfactants, representing that "[a]ll existing scientific knowledge indicates that the presence of these materials at these very low levels does not pose a human health or environmental risk."[48]

183.    In 2001, *Scientific American* published an article on the discontinuation of Scotchgard stating that "[d]espite the chemical's [PFOS'] ubiquity, company [3M] officials are adamant that there is no evidence of any danger thus far."  The article, which relied in part on

---

[47] Caroline Mayer and David Brown, *3M to Discontinue Some Scotchgard Repellent Products*, WASHINGTON POST (May 17, 2000), https://www.washingtonpost.com/archive/politics/2000/05/17/3m-to-pare-scotchgard-products/41be792c-9ba3-49ef-8133-eec9d9fb3db5/.

[48] *3M Phasing Out Some of its Specialty Materials*, 3M (May 16, 2000).

information from John Giesy, claims that "[m]ost researchers say this speculation [about PFOS posing a danger to wildlife] is premature and that there is no evidence that PFOS in the environment is harming humans or animals."[49]

184.    In 2006, *Furniture Today*, a weekly business newspaper for the American furniture industry, published an article announcing the relaunch of Scotchgard.  The article quoted 3M Business Development Manager Mitch Culbreath, who stated that the new product "provides all of the performance benefits consumers expect…with products that are not based on PFOA or PFOS chemistry."[50]  The article makes no mention of the fact that the new Scotchgard formulation still contains PFAS and implies that it is the "environmentally responsible choice."

185.    DuPont hired several consultants and paid them thousands of dollars to implement a company strategy to attack and discredit studies that alleged PFOA causes adverse health effects, to prevent third parties from connecting DuPont and its PFOA manufacturing to health problems, and to thwart PFOA-related litigation.

186.    In March and April 2003, DuPont employees and executives, including its CEO, Vice President, and General Manager of Fluoroproducts, and Haskell Laboratory Director, all made public statements denying they had seen any negative impacts on human health or the environment caused by DuPont's use of PFOA.

187.    During the early 2000s, *Chemical Week*, a magazine that serves the global chemical industry, published numerous articles quoting DuPont spokespersons on the safety of PFOA. These statements include the following: "PFOA is not harmful to human health or the environment,

---

[49] Rebecca Renner, *Scotchgard Scotched*, 248 SCIENTIFIC AMERICAN 18 (Mar. 1, 2001).
[50] *Quaker, 3M to Relaunch Scotchgard*, FURNITURE TODAY (Sept. 4, 2006), https://www.furnituretoday.com/business-news/quaker-3m-to-relaunch-scotchgard/.

and there is a substantial volume of information to back that up."[51] "There is an extensive database of over 200 reports addressing all the major hazard end points. We have reviewed all of this data and there are no health effects associated with PFOA."[52] "Given the extremely small levels of PFOA exposure generally seen outside the work setting, it is my medical opinion that no association would be seen in the general public."[53]

188.     In a 2005 *Washington Post* Article, DuPont Spokesperson Clifton Webb is quoted saying: "[b]ased on an evaluation of human health and toxicology studies, DuPont believes that the weight of evidence suggests that PFOA exposure does not cause cancer in humans and does not pose a health risk to the general public… To date, no human health effects are known to be caused by PFOA, even in workers who have significantly higher exposure levels than the general population."[54]

189.     In November 2005, DuPont was quoted in a *Chemical Week* article on the safety of food contact paper made with PFAS saying, "[a]llegations that food-contact paper made with DuPont materials contain unsafe levels of PFOA (C-8) are false. FDA has cleared these materials for consumer use since the late 1960s and DuPont has complied with FDA regulations and standards regarding these products."[55]

---

[51] Robert Westervelt, *DuPont Faces EPA Action over PFOA Disclosure*, CHEMICAL WEEK (June 23, 2004).
[52] Kara Sissel, *EPA Report Raises Concerns About PFOA*, CHEMICAL WEEK (Apr. 29, 2003).
[53] Kara Sissel, *EPA PFOA Assessment Raises Questions*, CHEMICAL WEEK (Jan. 19, 2005).
[54] Juliet Eilperin, *Compound in Teflon a 'Likely Carcinogen'*, WASHINGTON POST (June 29, 2005), https://www.washingtonpost.com/archive/politics/2005/06/29/compound-in-teflon-a-likely-carcinogen/5cca31d1-0c50-4c56-948a-c27d300d4dd6/.
[55] Michelle Bryner, *Former DuPont Engineer Alleges PFOA Cover-Up*, CHEMICAL WEEK (Nov. 23, 2005).

190.     In July 2005, the global science magazine *Nature* published an article that quoted DuPont Spokesperson Cliff Webb saying that "[c]onsumers using products sold under the Teflon brand are safe."[56]

191.     In May 2008, DuPont ran an advertisement for fluorotelomer products in *CoatingsTech*, a national journal for the coatings industry.  The ad suggested that the products were environmentally safe stating that, "DuPont has introduced a new line of fluorotelomer products for use in repellents and surfactants.  The Capstone products, which are based on short-chain chemistry that reduces the PFOA content levels significantly, meet current environmental standards."[57]

192.     As late as March 2009, DuPont reviewed and approved issuance of a press release by the Sapphire Group, one of DuPont's consultants, which falsely claimed that PFOA in drinking water was completely safe, despite DuPont's knowledge about the toxicity of PFAS.

193.     Defendants AGCCA, Arkema, and Solvay were members of the ammonium perfluorononanoate ("APFN") Work Group, which was "[f]ormed to evaluate APFN as compared to APFO."  APFN is a form of PFNA, which is a PFAS.

194.     On January 16, 2003, the APFN Work Group gave a presentation to the U.S. EPA where it aimed to downplay any concerns related to PFNA.  The group suggested PFNA would not become a widespread problem because "APFN [is] not widely used," "[s]ignificant reduction[s] in potential exposure sources [were] planned," and "[t]oxicity and environmental effects work" on PFNA was still "progressing."

---

[56] Mark Peplow, *DuPont Stuck with Teflon Lawsuits*, NATURE, July 25, 2005. https://www.nature.com/news/2005/050725/full/news050725-3.html.
[57] *Fluorotelomer Products*, CoatingsTech, May 2008, at 75.

195.    Defendants AGCCA, Archroma, Arkema, Chemours, Clariant Corporation, Daikin, and Solvay were members of the FluoroCouncil, a group formed to represent the interests of the world's leading manufacturers of fluorotechnology products.  In 2018, the FluoroCouncil announced a new website "that showcases information on the benefits and safety of fluorinated chemistries," despite the industry's knowledge of the toxicity of PFAS.  A blog post touting the new website noted that "Fluorinated chemistries, or per- and polyfluoroalkyl substances (PFAS), are a diverse group of chemistries characterized by the strong bond between fluorine and carbon. Fluorinated chemistries provide products with the resilience and durability they require, and such products can be used safely."[58]

196.    In 2019, the FluoroCouncil informed the U.S. EPA that short-chain PFAS, like PFHxA, are "widely understood not to present toxicity concerns" and that "studies show short-chain fluorotelomer-based products do not present significant adverse impacts."[59]

197.    Defendants, including at least 3M, continue to this day to deny the adverse effects on the environment and human health caused by PFAS contamination.

198.    3M Spokesperson Fanna Haile-Selassie was quoted in a 2018 *Bloomberg* article saying that "[w]hile the science behind PFAS is complex, the vast body of scientific evidence,

[58] Jessica Bowman, *New website provides information on the benefits and safety of fluorinated chemistries*, AMERICAN CHEMISTRY COUNCIL (Jan. 10, 2018), https://www.americanchemistry.com/chemistry-in-america/news-trends/blog-post/2018/new-website-provides-information-on-the-benefits-and-safety-of-fluorinated-chemistries.
[59] *Briefing to ERG/EPA ELG Program*, PFAS Overview, FluoroCouncil (Aug. 26, 2019) (EPA-H!-OW-2020-0099).

which consists of decades of research conducted by independent third parties and 3M does not show that PFOS or PFOA causes harm in people at current or historical levels."[60]

199.    In September 2019, 3M Senior Vice President Denise Rutherford appeared before the House Committee on Oversight and Reform's Environment Subcommittee and testified that she agreed with the statement: "[t]he weight of current scientific evidence does not show that PFOS or PFOA cause adverse health effects in humans at current rates of exposure."[61]

200.    As of the date of the filing of this Complaint, a website sponsored by Defendant 3M asserts that "the weight of scientific evidence does not show that PFOS or PFOA causes harm to the environment or people at current or historical levels."[62]

201.    Defendants have earned extraordinary profits from their PFAS-related business practices.

202.    Defendants did not inform any regulatory agency or the public about the toxic nature of PFAS for fear of losing the extraordinary profits from their PFAS manufacturing businesses.

203.    At all relevant times, Defendants, individually and/or collectively, have had the resources and ability to fund or sponsor any study, investigation, testing, and/or other research of any kind of the nature Defendants claim is necessary to confirm and/or prove that the presence of any one and/or combination of PFAS in human blood causes any disease and/or adverse health impact of any kind in humans, presents any risk of harm to humans, and/or is of any legal,

---

[60] Tiffany Kary and Christopher Cannon, *Cancer-linked Chemicals Manufactured by 3M are Turning up in Drinking Water*, BLOOMBERG (Nov. 2, 2018, 5:00 AM EDT), https://www.bloomberg.com/graphics/2018-3M-groundwater-pollution-problem/?leadSource=uverify%20wall.
[61] Oversight Committee, *Rep. Ocasio-Cortez at PFAS Part 3*, YOUTUBE (Sept. 11, 2019), https://www.youtube.com/watch?v=1bZDyWTvSMs.
[62] *The Facts on PFAS*, *supra* note 4.

toxicological, or medical significance to humans, according to standards Defendants deem acceptable.

204.     At all relevant times, Defendants shared and/or should have shared among themselves, all relevant information relating to the presence, biopersistence, and bioaccumulation of PFAS in the environment and in human blood and associated toxicological, epidemiological, and/or other adverse effects and/or risks.

205.     Defendants have intentionally, purposefully, recklessly, and/or negligently chosen not to fund or sponsor any study, investigation, testing, and/or other research described in the preceding paragraph.

206.     At all relevant times, Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS in human blood and any alleged adverse impacts and/or risks associated therewith, effectively preventing the State from discovering the existence and extent of any harm as alleged herein.

207.     At all relevant times, Defendants, through their acts and/or omissions, took steps to attack, challenge, discredit, and/or otherwise undermine any scientific studies, findings, statements, and/or other information that proposed, alleged, suggested, or even implied any potential adverse environmental damage and health effects or risks and/or any other fact of any legal, toxicological, or medical significance associated with the presence of PFAS in the environment and human blood.

208.     At all relevant times, Defendants, through their acts and/or omissions, concealed and/or withheld information from their customers, governmental entities, and the public that would

35

have properly and fully alerted Illinois to the environmental, toxicological, medical, or other significant risks from PFAS contamination.

209.    At all relevant times, Defendants encouraged the continued and even further increased use and release into the environment of PFAS, including into Illinois, by their customers and others, and tried to encourage and foster the increased and further use of PFAS, including in Illinois, in connection with as many products/uses and applications as possible, despite knowledge of the toxicity, persistence, and bioaccumulation concerns associated with such activities.

210.    Despite their explicit knowledge of the dangers of PFAS, Defendants deliberately and intentionally concealed the dangers of PFAS from governmental entities, including the State of Illinois and its agencies, and the public at large to protect profits and avoid public responsibility for injuries and damage caused by their toxic products.

211.    Defendants' negligent, intentional, and reckless actions have contaminated and injured, and continue to contaminate and injure, the environment and natural resources of Illinois, harmed Illinois property, and placed Illinois residents at risk.

## IV.    Historical DuPont's spinoff of The Chemours Company.

212.    Chemours was organized by DuPont in the state of Delaware on February 18, 2014 as Performance Operations, LLC, for the purpose of transferring to Chemours assets and liabilities, including any entities holding assets and liabilities, associated with certain of DuPont's Performance Chemicals segment.  Chemours changed its name to The Chemours Company, LLC on April 15, 2014.  The Chemours Company, LLC had nominal operations during the period from

February 18, 2014 through December 31, 2014. The Chemours Company, LLC was converted from a limited liability company to a Delaware corporation on April 30, 2015.[63]

213. In July 2015, Historical DuPont transferred to The Chemours Company its "performance chemicals" business line, including titanium technologies, fluoroproducts, and chemical solutions.[64]

214. In addition to the transfer of assets, The Chemours Company accepted broad assumption of many liabilities for Historical DuPont's historical use, manufacture, and discharge of PFAS, although the specific details regarding the liabilities that The Chemours Company assumed are set forth in the non-public schedules.[65]

215. The transfer to The Chemours Company of Historical DuPont's performance chemicals business line, which was loaded with failing products and substantial debts, as well as many environmental liabilities from Historical DuPont, which were known by Historical DuPont to be extraordinarily large, resulted in a transfer in which The Chemours Company did not receive a reasonably equivalent value in exchange for the transfer or obligation.

216. Further, the assets transferred to The Chemours Company were unreasonably small in relation to the business or transaction. Historical DuPont believed or reasonably should have believed that The Chemours Company would incur debts beyond its ability to pay them as they became due.

---

[63] *See The Chemours Company SEC Information Statement*, SEC.GOV (June 5, 2015), https://www.sec.gov/Archives/edgar/data/1627223/000119312515215110/d832629dex991.htm
[64] *See id.*
[65] *See generally*, *Separation Agreement by and between E. I. DuPont de Nemours and Company and The Chemours Company* (the "Separation Agreement"), SEC.GOV (June 26, 2015), https://www.sec.gov/Archives/edgar/data/1627223/000119312515215110/d832629dex991.htm.

217.    At the time of those transfers, the performance chemicals business line carried an estimated debt and/or liabilities of approximately $4 billion.

218.    In 2015, prices of Titanium Dioxide plummeted, significantly decreasing the value of Historical DuPont's titanium technologies business line.[66]

219.    Historical DuPont had also promised to phase out production and use of PFOA, a major component of its fluoroproducts line, by 2015.

220.    Under the Separation Agreement, The Chemours Company agreed to indemnify Historical DuPont against, and assumed for itself, all "Chemours Liabilities," which is defined broadly to include, among other things, "any and all liabilities relating," "primarily to, arising primarily out of or resulting primarily from, the operation of or conduct of the [Performance Chemicals] Business at any time." This indemnification is uncapped and does not have a survival period.[67]

221.    The Chemours Company agreed to indemnify Historical DuPont against and assume for itself the Performance Chemical Business's liabilities regardless of: (a) when or where such liabilities arose; (b) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (c) where or against whom such liabilities are asserted or determined; (d) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud, or misrepresentation by any member of the

---

[66] *See, e.g.*, Cyrus Sanati, *How DuPont Spinoff Chemours Came Back from the Brink*, FORTUNE (May 18, 2016, 9:56 AM CDT), https://fortune.com/2016/05/18/how-dupont-spinoff-chemours-came-back-from-the-brink/.
[67] *See* Separation Agreement, *supra* note. 51, at 11.

Historical DuPont group or the Chemours group; and (e) which entity is named in any action associated with any liability.[68]

222.    The Chemours Company agreed to indemnify Historical DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the Performance Chemicals Business.[69]  Such liabilities were deemed "primarily associated" if Historical DuPont reasonably determined that 50.1% of the liabilities were attributable to the Performance Chemicals Business.[70]

223.    The Chemours Company also agreed to use its best efforts to be fully substituted for Historical DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities . . . ."[71]

224.    At the time of the July 2015 spinoff, Historical DuPont was well aware of its potential liabilities related to PFAS contamination throughout the United States.

225.    Until the spinoff was complete, The Chemours Company was a wholly owned subsidiary of Historical DuPont.  Although The Chemours Company had a separate board, the board was controlled by Historical DuPont employees.

226.    Once the spinoff was complete, seven new members of The Chemours Company board were appointed, for an eight-member board of directors of the new public company.  The negotiations concerning the spinoff were conducted and the related decisions were made while the board was still controlled by Historical DuPont.

---

[68] *Id.* at 53–65 (Article VI—Indemnification).
[69] *Id.* at 7, 53–65 (Article VI—Indemnification).
[70] *Id.*
[71] *Id.* at 63.

39

227.    The new independent board appointed upon the completion of the spinoff did not take part in the negotiations of the terms of the separation.

228.    In 2005, Historical DuPont agreed to pay $16.5 million to resolve eight counts brought by the U.S. EPA alleging violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act concerning the toxicity of PFAS.[72]  At the time, it was the largest such penalty in history.[73]

229.    Also in 2005, Historical DuPont settled a class action lawsuit filed on behalf of 70,000 residents of Ohio and West Virginia for $343 million.[74]  Under the terms of the 2005 class action settlement, Historical DuPont agreed to fund a panel of scientists to determine if any diseases were linked to PFOA exposure, to filter local water for as long as C-8 (*i.e.*, long-chain PFAS) concentrations exceeded regulatory thresholds, and to set aside $235 million for ongoing medical monitoring of the affected community.[75]  This panel was known as the C-8 Science Panel and is discussed above and herein.

230.    After eight years, the C-8 Science Panel found several significant diseases, including cancer, with a probable link to PFOA.[76]

---

[72] *See Reference News Release: EPA Settles PFOA Case Against DuPont for Largest Environmental Administrative Penalty in Agency History*, U.S. EPA (DEC. 14, 2005), https://www.epa.gov/archive/epapages/newsroom_archive/newsreleases/fdcb2f665cac66bb852570d7005d6665.html.

[73] *Id.*

[74] *See* Settlement Agreement in *Leach v. E.I DuPont de Nemours and Co.*, No. 01-C-608 (W. Va. Cir. Ct.).

[75] *Id.*

[76] *See C8 Probable Link Reports*, *supra* note 42.

40

231. Thereafter, more than 3,500 personal injury claims were filed in Ohio and West Virginia as part of the 2005 settlement that were consolidated into a multidistrict litigation court in Ohio (the Ohio MDL).[77]

232. As The Chemours Company explained in its November 2016 SEC filing: "[s]ignificant unfavorable outcomes in a number of cases in the [Ohio] MDL could have a material adverse effect on Chemours consolidated financial position, results of operations or liquidity."[78]

233. Juries in three bellwether trials returned multimillion-dollar verdicts against Historical DuPont, awarding compensatory damages and, in two cases, punitive damages to plaintiffs who claimed that PFOA exposure caused their illnesses.[79]

234. On February 13, 2017, Historical DuPont and The Chemours Company agreed to pay $671 million to resolve the Ohio MDL.[80]

235. The Chemours Company also agreed to pay $25 million for future PFOA costs not covered by the settlement for each of the next five years (up to an additional $125 million).[81]

236. Historical DuPont also agreed to cover additional amounts up to $25 million for five years.[82]

---

[77] *See In re: E.I. du Pont de Nemours and Co. C-8 Personal Injury Litig.*, No. 1-13-MD-2433 (S.D. Ohio).

[78] *See The Chemours Company SEC Form 10-Q Quarterly Report*, U.S. SECURITIES AND EXCHANGE COMMISSION, at 22 (Nov. 2016), http://d18rn0p25nwr6d.cloudfront.net/CIK-0001627223/595eddb7-8814-4221-a013-d8e5c2fabea3.pdf.

[79] *See* Erica Teichert, *Jury orders DuPont to pay $10.5 million over leaked chemical*, REUTERS (Jan. 5, 2017, 9:49 AM), https://www.reuters.com/article/us-du-pont-verdict/jury-orders-dupont-to-pay-10-5-million-over-leaked-chemical-idUSKBN14P1VD.

[80] Kris Maher and Cameron McWhirter, *DuPont Settlement of Chemical Exposure Case Seen as "Shot in the Arm" for Other Suits*, THE WALL STREET JOURNAL (Feb. 13, 2017, 12:30 PM ET), https://www.wsj.com/articles/dupont-chemours-settle-teflon-chemical-exposure-case-for-671-million-1486987602.

[81] *See DowDupont Inc. SEC Form 10-Q Quarterly Report*, SEC.GOV at 43 (for the period ending Sept. 30, 2017), https://www.sec.gov/Archives/edgar/data/1666700/000166670017000026/dowdupont3q17093017.htm.

[82] *Id.*

237.    At the time of the transfer of its Performance Chemicals Business to The Chemours Company, Historical DuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Historical DuPont's liability for damages and injuries from the manufacture of PFAS and products that contain PFAS.

238.    The Chemours Company also assumed the obligation to clean-up Pompton Lakes, New Jersey, where Historical DuPont manufactured explosives from 1902 to 1994, and where lead salts, mercury, volatile organic compounds, explosive powders, chlorinated solvents, and detonated blasting caps still contaminate groundwater and soil. The Chemours Company's SEC filings estimate that the remediation, which began in 1985, may cost as much as $119 million to complete.[83]

239.    Creating The Chemours Company and engaging in the above-described corporate machinations was an attempt to segregate a large portion of Historical DuPont's environmental liabilities, including liabilities related to its PFAS.

240.    Through the consolidation of Historical DuPont's performance chemical liabilities, DuPont has attempted to limit the availability of funds arising out of—and necessary to pay damages for—that DuPont's liability.

## V.    Illinois' actions to protect human health and the environment from PFAS contamination.

241.    PFAS contamination is a serious threat to human health and Illinois' natural resources and property.

242.    Pursuant to 35 Ill. Adm. Code 620.605, the Illinois EPA shall issue a Health

---

[83] *Id.* at 23.

Advisory when there is a confirmed detection in a community water supply well of a chemical substance for which no numeric groundwater standard exists. The health-based guidance levels contained in a Health Advisory represent concentrations in drinking water at which no adverse health effects are expected to occur. A Health Advisory can be issued in the absence of standards under Section 620.410, groundwater quality standards, and when "the chemical substance is toxic or harmful to human health."

243. The Illinois EPA must consider the guidance level established in a Health Advisory when (1) establishing "groundwater cleanup or action levels whenever there is a release or substantial threat of a release of… [a] hazardous substance or pesticide… or [o]ther contaminant that represents a significant hazard to public health or the environment;" (2) determining "whether the community water supply is taking its raw water from a site or source consistent with the [applicable] siting and source water requirements;" and (3) developing Illinois Pollution Control Board ("Board") "rulemaking proposals for new or revised numerical standards."[84]

244. On January 28, 2021, the Illinois EPA announced Health Advisory Levels for PFBS, PFHxS, PFHxA, and PFOA.[85] On April 16, 2021, the Illinois EPA announced a new Health Advisory Level for PFOS and a revised level for PFBS because the U.S. EPA updated its Provisional Peer-Reviewed Toxicity Value for PFBS.[86] On July 27, 2021, the Illinois EPA announced a new Health Advisory Level for PFNA.

---

[84] 35 Ill. Admin. Code Section 620.601.
[85] *See Illinois EPA Issues Health Advisories for Per- and Polyfluoroalkyl Substances (PFAS) in Accordance with Illinois Groundwater Regulations*, ILLINOIS ENV'T PROT. AGENCY (JAN. 28, 2021), https://www.illinois.gov/news/press-release.22728.html.
[86] *See Illinois Issues Health Advisory for Perfluorooctanesulfonic Acid (PFOS) and an Updated Health Advisory for Perfluorobutanesulfonic Acid (PFBS)*, ILLINOIS ENV'T PROT. AGENCY (Apr. 16, 2021), https://www2.illinois.gov/Pages/news-item.aspx?ReleaseID=23151.

245.    The current Illinois EPA Health Advisory Levels are listed below.

| Specific PFAS | Health Advisory Level in Nanograms/Liter parts per trillion ("ppt") | Chemical Abstract Services Registry Number (CASRN) |
|---|---|---|
| PFOA | 2 | 335-67-1 |
| PFHxA | 560,000 | 307-24-4 |
| PFOS | 14 | 1763-23-1 |
| PFHxS | 140 | 355-46-4 |
| PFBS | 2,100 | 375-73-5 |
| PFNA | 21 | 375-95-1 |

246.    On May 12, 2021, the Illinois EPA presented to stakeholders and solicited comments regarding updated proposed amendments to the 35 Ill. Adm. Code 620 groundwater quality standards, as a Pre-Filing Public Comment Period. Among other things, the proposed amendments included groundwater quality standards for five PFAS--PFBS, PFHxS, PFOA, PFNA, and PFOS. On December 8, 2021, the Illinois EPA filed with the Illinois Pollution Control Board a Motion for Acceptance requesting that the Board accept the proposed groundwater quality standards for six PFAS – PFBS, PFHxS, PFOA, PFNA, PFOS, and HFPO-DA.[87] The proposed standards are listed below:

---

[87] *See 620 Groundwater Quality*, ILLINOIS ENV'T PROT. AGENCY, https://www2.illinois .gov/epa/topics/water-quality/groundwater/Pages/620-Groundwater-Quality.aspx (last visited Jan. 19, 2023).

| Specific PFAS | Proposed Class I and Class II Groundwater Quality Standard in Nanograms/Liter (ppt) | Chemical Abstract Services Registry Number (CASRN) |
|---|---|---|
| PFOA | 2 | 335-67-1 |
| PFNA | 12 | 375-95-1 |
| PFOS | 7.7 | 1763-23-1 |
| PFHxS | 77 | 355-46-4 |
| PFBS | 1,200 | 375-73-5 |
| HFPO-DA | 12 | 13252-13-6 |

247.    Because PFAS are persistent in the environment, unless PFAS are actively cleaned up from contaminated natural resources and property under the jurisdiction of the State, these chemicals will remain within the State and continue to contaminate and injure natural resources and property under the jurisdiction of the State indefinitely.

## VI.    Illinois' investigation of the PFAS crisis.

248.    In tandem with the Illinois EPA's establishment of PFAS Health Advisory Levels, Illinois EPA has implemented an aggressive PFAS sampling plan.

249.    Illinois EPA recently conducted a statewide investigation into the prevalence and occurrence of PFAS in finished water at 1,428 entry points to the distribution system representing 1,749 community water supplies ("CWSs") across Illinois.[88]

250.    The expenditures to conduct the CWS investigation would not have been necessary absent Defendants' sale and dissemination of PFAS into the State of Illinois, which, when used as intended, would inevitably contaminate natural resources and endanger people, animals, and the environment.

251.    Illinois EPA analyzed eighteen PFAS compounds as part of this investigation.[89]

252.    Of the 1,428 entry points sampled, Illinois EPA detected levels of PFAS that were greater than or equal to Illinois' Health Advisory Levels at 70 entry points.  Those entry points with elevated levels of PFAS, as defined in paragraphs 15-17 herein, are referred to as "PFAS Sites."

253.    Some of the PFAS Sites include the following.

**Evanston CWS – Cook County, Illinois**

254.    The Evanston CWS is located in Cook County, Illinois.

255.    Illinois EPA sampled the Evanston CWS and detected PFOA greater than or equal to the Illinois Health Advisory Level and PFOS greater than or equal to the minimum reporting level.

256.    The State of Illinois has conducted a preliminary investigation into potential sources of PFAS contamination at the Evanston CWS, including a review of spatial, topographic,

---

[88] *See PFAS Statewide Investigation Network: Community Water Supply Sampling*, ILLINOIS ENV'T PROT. AGENCY, https://www2.illinois.gov/epa/topics/water-quality/pfas/Pages/pfas-statewide-investigation-network.aspx last visited Jan. 19, 2023).
[89] *Id.*

and aerial maps; a review of US EPA and Illinois EPA documents and databases; and a search of news sources to identify potential sources.

257.    Based on this preliminary investigation, the People have further concluded that AFFF is not a suspected source of PFAS contamination detected at the Evanston CWS.

258.    There are no known military facilities in proximity to the Evanston CWS that could result in AFFF contamination to the wells from which the Evanston CWS draws water.

259.    There is no mechanism or transport method for firefighting training centers to impact the wells from which the Evanston CWS draws water.

260.    There are no known airports that would have been required to use AFFF nearby, upgradient, or upstream from the wells from which the Evanston CWS draws water.

### Glencoe CWS – Cook County, Illinois

261.    The Glencoe CWS is located in Cook County, Illinois.

262.    Illinois EPA sampled the Glencoe CWS and detected PFOA greater than or equal to the Illinois Health Advisory Level and PFOS greater than or equal to the minimum reporting level.

263.    The State of Illinois has conducted a preliminary investigation into potential sources of PFAS contamination at the Glencoe CWS, including a review of spatial, topographic, and aerial maps; a review of US EPA and Illinois EPA documents and databases; and a search of news sources to identify potential sources.

264.    Based on this preliminary investigation, the People have further concluded that AFFF is not a suspected source of PFAS contamination detected at the Glencoe CWS.

265.    There are no known military facilities in proximity to the Glencoe CWS that could result in AFFF contamination to the wells from which the Glencoe CWS draws water.

266.    There is no mechanism or transport method for firefighting training centers to impact the wells from which the Glencoe CWS draws water.

267.    There are no known airports that would have been required to use AFFF nearby, upgradient, or upstream from the wells from which the Glencoe CWS draws water.

**Winnetka CWS – Cook County, Illinois**

268.    The Winnetka CWS is located in Cook County, Illinois.

269.    Illinois EPA sampled the Winnetka CWS and detected PFOA greater than or equal to the Illinois Health Advisory Level and PFOS greater than or equal to the minimum reporting level.

270.    The State of Illinois has conducted a preliminary investigation into potential sources of PFAS contamination at the Winnetka CWS, including a review of spatial, topographic, and aerial maps; a review of US EPA and Illinois EPA documents and databases; and a search of news sources to identify potential sources.

271.    Based on this preliminary investigation, the People have further concluded that AFFF is not a suspected source of PFAS contamination detected at the Winnetka CWS.

272.    There are no known military facilities in proximity to the Winnetka CWS that could result in AFFF contamination to the wells from which the Winnetka CWS draws water.

273.    There is no mechanism or transport method for firefighting training centers to impact the wells from which the Winnetka CWS draws water.

274.    There are no known airports that would have been required to use AFFF nearby, upgradient, or upstream from the wells from which the Winnetka CWS draws water.

**Wilmette CWS – Cook County, Illinois**

275.    The Wilmette CWS is located in Cook County, Illinois.

48

276.     Illinois EPA sampled the Wilmette CWS and detected PFOA greater than or equal to the Illinois Health Advisory Level and PFOS greater than or equal to the minimum reporting level.

277.     The State of Illinois has conducted a preliminary investigation into potential sources of PFAS contamination at the Wilmette CWS, including a review of spatial, topographic, and aerial maps; a review of US EPA and Illinois EPA documents and databases; and a search of news sources to identify potential sources.

278.     Based on this preliminary investigation, the People have further concluded that AFFF is not a suspected source of PFAS contamination detected at the Wilmette CWS.

279.     There are no known military facilities in proximity to the Wilmette CWS that could result in AFFF contamination to the wells from which the Wilmette CWS draws water.

280.     There is no mechanism or transport method for firefighting training centers to impact the wells from which the Wilmette CWS draws water.

281.     There are no known airports that would have been required to use AFFF nearby, upgradient, or upstream from the wells from which the Wilmette CWS draws water.

**Hawthorn Estates CWS – Grundy County, Illinois**

282.     The Hawthorn Estates CWS is located in Grundy County, Illinois.

283.     Illinois EPA sampled the Hawthorn Estates CWS and detected PFOA greater than or equal to the Illinois Health Advisory Level and PFOS and PFBS greater than or equal to the minimum reporting levels.

284.     The State of Illinois has conducted a preliminary investigation into potential sources of PFAS contamination at the Hawthorn Estates CWS, including a review of spatial,

49

topographic, and aerial maps; a review of US EPA and Illinois EPA documents and databases; and a search of news sources to identify potential sources.

285.    This preliminary investigation identified the presence of several industries and operations generally known to result in PFAS contamination.

286.    Potential sources of PFAS contamination to the Hawthorn Estates CWS include local septic systems, biosolids application, and several former industrial facilities, including an excavation company, barge docking operation, and a sand and gravel quarry.

287.    Based on this preliminary investigation, the People have further concluded that AFFF is not a suspected source of PFAS contamination detected at the Hawthorn Estates CWS.

288.    There are no known military facilities in proximity to the Hawthorn Estates CWS that could result in AFFF contamination to the wells from which the Hawthorn Estates CWS draws water.

289.    There is no mechanism or transport method for firefighting training centers to impact the wells from which the Hawthorn Estates CWS draws water.

290.    There are no known airports that would have been required to use AFFF nearby, upgradient, or upstream from the wells from which the Hawthorn Estates CWS draws water.

291.    There are no known records of fires or explosions, which would have been extinguished with AFFF, or spills of AFFF in the areas surrounding the wells from which the Hawthorn Estates CWS draws water.

**Antioch CWS –Lake County, Illinois**

292.    The Antioch CWS is located in Lake County, Illinois.

293.    Illinois EPA sampled the Antioch CWS and detected PFOA greater than or equal to the Illinois Health Advisory Level.

50

294.     The State of Illinois has conducted a preliminary investigation into potential sources of PFAS contamination at the Antioch CWS, including a review of spatial, topographic, and aerial maps; a review of US EPA and Illinois EPA documents and databases; and a search of news sources to identify potential sources.

295.     This preliminary investigation identified the presence of several industries and operations generally known to result in PFAS contamination.

296.     Potential sources of PFAS contamination to the Antioch CWS include biosolids applications, a stormwater impoundment, farms, a trailer/RV park, and an industrial center with several industries traditionally known to use PFAS, including metal coating and plating, electronics manufacturing, and plastic/resin manufacturing.

297.     Based on this preliminary investigation, the People have further concluded that AFFF is not a suspected source of PFAS contamination detected at the Antioch CWS.

298.     There are no known military facilities in proximity to the Antioch CWS that could result in AFFF contamination to the well from which the Antioch CWS draws water.

299.     There is no mechanism or transport method for firefighting training centers to impact the well from which the Antioch CWS draws water.

300.     There are no known airports that would have been required to use AFFF nearby, upgradient, or upstream from the well from which the Antioch CWS draws water.

301.     There are no known records of fires or explosions, which would have been extinguished with AFFF, or spills of AFFF in the areas surrounding the wells from which the Antioch CWS draws water.

### Fox Lake CWS – Lake County, Illinois

302.     The Fox Lake CWS is located in Lake County, Illinois.

51

303.    Illinois EPA sampled the Fox Lake CWS and detected PFOA greater than or equal to the Illinois Health Advisory Level and PFOS and PFHxS greater than or equal to the minimum reporting levels.

304.    The State of Illinois has conducted a preliminary investigation into potential sources of PFAS contamination at the Fox Lake CWS, including a review of spatial, topographic, and aerial maps; a review of US EPA and Illinois EPA documents and databases; and a search of news sources to identify potential sources.

305.    This preliminary investigation identified the presence of several industries and operations generally known to result in PFAS contamination.

306.    Potential sources of PFAS contamination to the Fox Lake CWS include a chrome plating facility, a wastewater treatment plant, a paving company, and various automotive repair shops.

307.    Based on this preliminary investigation, the People have further concluded that AFFF is not a suspected source of PFAS contamination detected at the Fox Lake CWS.

308.    There are no known military facilities in proximity to the Fox Lake CWS that could result in AFFF contamination to the well from which the Fox Lake CWS draws water.

309.    There is no mechanism or transport method for firefighting training centers to impact the well from which the Fox Lake CWS draws water.

310.    There are no known airports that would have been required to use AFFF nearby, upgradient, or upstream from the well from which the Fox Lake CWS draws water.

311.    There are no known records of fires or explosions, which would have been extinguished with AFFF, or spills of AFFF in the areas surrounding the wells from which the Fox Lake CWS draws water.

312. The above list is not exhaustive. Ongoing and additional testing will almost certainly reveal further PFAS contamination and injury to Illinois' environment and natural resources around the CWSs identified above and additional locations yet to be sampled.

313. As Illinois' investigation continues, Illinois reserves the right to supplement the above list.

## VII. State natural resource and property damage.

314. PFAS contamination at the CWSs identified above and additional locations yet to be determined has injured the State's natural resources and/or adversely impacted its beneficial public trust uses including those for drinking water, recreation, fishing, agriculture, and other uses.

315. PFAS contamination at the CWSs identified above and additional locations yet to be determined has substantially damaged the intrinsic value of these State natural resources.

316. Illinois and its residents have been deprived of the full use, enjoyment, and benefit of the State's public trust resources, and the intrinsic value of such State natural resources, and have been substantially harmed by PFAS contamination, as identified above.

317. The State's natural resources and property will continue to be harmed and injured for the foreseeable future by the ongoing release and/or spread of PFAS, as identified above.

318. Defendants' acts and/or omissions have caused and/or contributed to cause PFAS contamination, as identified above.

319. Each of the State's natural resources is inherently precious, limited, and invaluable in and of itself and to humans, as described in more detail below.

**Groundwater.**

320.     The State's public policy for groundwater is set forth in Section 2 of the Illinois

Groundwater Protection Act.

(a)     The General Assembly finds that:

(i) a large portion of Illinois' citizens rely on groundwater for personal consumption, and industries use a significant amount of groundwater;

(ii) *contamination of Illinois groundwater will adversely impact the health and welfare of its citizens and adversely impact the economic viability of the State*;

(iii) contamination of Illinois' groundwater is occurring;

(iv) *protection of groundwater is a necessity for future economic development in this State*.

(b)     Therefore, it is the *policy of the State of Illinois to restore, protect, and enhance the groundwaters of the State, as a natural and public resource*. The State recognizes the essential and pervasive role of groundwater in the social and economic well-being of the people of Illinois, and its vital importance to the general health, safety, and welfare. It is further recognized as consistent with this policy that the groundwater resources of the State be utilized for beneficial and legitimate purposes; *that waste and degradation of the resources be prevented*; and *that the underground water resource be managed to allow for maximum benefit of the people of the State of Illinois*.

415 ILCS 55/2 (2020) (emphasis added).

321.     Groundwater resources can be exposed to PFAS contamination in several ways,

including when infiltrating precipitation transports surface contaminants from soils through the

unsaturated zone and into shallow groundwater.

322.     Defendants have contaminated and injured the State's groundwater, relied upon by

some of the CWSs identified above, and additional locations yet to be determined with PFAS and

PFAS-containing waste.

323.    Defendants have contaminated and injured surface water and groundwater resources at the CWSs as identified above, and additional locations yet to be determined, with PFAS and PFAS-containing waste.

324.    Ongoing additional testing continues to reveal further PFAS contamination and injury of groundwater around the State.  It is virtually certain that this additional testing will reveal further PFAS contamination of, and injury to, groundwater.

**Surface waters.**

325.    Section 11 of the Act provides, 415 ILCS 5/11 (2020), provides, in pertinent part, as follows:

> § 11. (a) The General Assembly finds:
>
> (1) that pollution of the waters of this State constitutes a menace to public health and welfare, creates public nuisances, is harmful to wildlife, fish, and aquatic life, impairs domestic, agricultural, industrial, recreational, and other legitimate beneficial uses of water, depresses property values, and offends the senses;
>
> \*              \*              \*
>
> (c) The provisions of this Act authorizing implementation of the regulations pursuant to an NPDES program shall not be construed to limit, affect, impair, or diminish the authority, duties and responsibilities of the Board, Agency, Department or any other governmental agency or officer, or of any unit of local government, to regulate and control pollution of any kind, to restore, to protect or to enhance the quality of the environment, or to achieve all other purposes, or to enforce provisions, set forth in this Act or other State law or regulation.

326.     Surface waters are precious, limited, and invaluable State natural resources that are used for drinking water, irrigation, recreation such as swimming and fishing, and ecological and other important purposes.

327.     State natural resources, including surface waters, are vital to the health, safety, and welfare of Illinois residents, and to the State's economy and ecology.

328.     Surface waters, such as lakes, rivers, and wetlands, can receive groundwater inflow and recharge groundwater.  The movement of water between groundwater and surface-water systems leads to the mixing of their water qualities.

329.     Defendants have contaminated and injured the State's surface waters, relied upon by some of the CWSs identified above, and additional locations yet to be determined with PFAS and PFAS-containing waste.

330.     Defendants have contaminated and injured drinking water that is drawn from surface water sources in locations at the CWSs identified above and additional locations yet to be determined with PFAS and PFAS-containing waste.

331.     Ongoing additional testing continues to reveal further PFAS contamination and injury of surface waters at and around CWSs in the State.  It is virtually certain that additional testing will reveal further PFAS contamination of, and injury to, surface waters.

**Wetlands.**

332.     Wetlands are highly productive, biologically diverse, precious, limited, and invaluable State natural resources that enhance water quality, control erosion, maintain stream

flows, sequester carbon, and provide a home to more than forty percent of all threatened and endangered species in Illinois

333.    Wetlands play an important role in drinking water, irrigation, agriculture, and other important purposes.

334.    State natural resources, including wetlands, are vital to the health, safety, and welfare of Illinois residents, and to the State's economy and ecology.

335.    Wetlands can receive groundwater inflow and recharge groundwater.   The movement of water between groundwater and surface-water systems such as wetlands can lead to the mixing of their water qualities.

336.    Multiple areas in and near the CWSs identified above are listed on the National Wetlands Inventory.

337.    Defendants have contaminated and injured the State's wetlands around the CWSs identified above and additional locations yet to be determined with PFAS and PFAS-containing waste.

338.    Defendants have contaminated and injured drinking water that is drawn from groundwater and surface waters with hydrological connections to wetlands in locations around the CWSs identified above and additional locations yet to be determined with PFAS and PFAS-containing waste.

339.    Ongoing additional testing will reveal further PFAS contamination and injury of wetlands around the CWSs identified above and additional locations yet to be determined.  It is virtually certain that this additional testing will reveal further PFAS contamination of, and injury to, wetlands.

**Wildlife, aquatic life, soils, and sediment.**

340.    Wildlife, aquatic life, soil, and sediments are precious, limited, and invaluable State natural resources.

341.    Defendants have contaminated and injured the State's wildlife, aquatic life, soil, and sediments around the CWSs identified above and additional locations yet to be determined.

342.    Agriculture is one of Illinois' largest industries, contributing billions annually to Illinois' economy.

343.    Illinois' wildlife and aquatic life are used for food and recreational purposes and provide a significant economic benefit to the State, including through tourism and recreation.

344.    Injuries to wildlife and aquatic life affect not only individual wildlife, but also the entire ecosystem of which they are a part.

345.    Ongoing additional testing continues to reveal further PFAS contamination and injury of agricultural operations, wildlife, aquatic life, soils, and sediment at and around the CWSs identified above and additional locations yet to be determined.  It is virtually certain that this additional testing will reveal further PFAS contamination of, and injury to, soils, sediments, and wildlife and aquatic life.

**VIII.   The PFAS contamination caused by Defendants must be addressed.**

346.    Illinois' environment and natural resources are currently, or may in the future be, detrimentally affected by Defendants' PFAS pollution of the State's natural resources and PFAS contamination as described herein.

347.    Proven and preliminary remedial techniques exist for cleaning up PFAS in environmental media and for successfully treating drinking water.

348.    Absent use of remediation and treatment methods, PFAS contamination will continue to spread through the natural resources and property under the jurisdiction of the State. Although PFAS are persistent in the environment, PFAS can be successfully remediated or successfully treated, and impacts to natural resources can be restored and compensated, but at significant expense.

349.    PFAS contamination levels in State natural resources including surface water, groundwater, drinking water, and wetlands typically fluctuate (*i.e*., increase and decrease) over time as PFAS moves through water and by other factors that impact hydrology, such as changes in seasonal precipitation levels.   Because PFAS levels can fluctuate at a single PFAS contamination site over time, the only way to be certain that PFAS no longer exist in State natural resources, such as surface water, groundwater, drinking water, and wetlands, and to restore those natural resources is to remediate or treat the PFAS.

350.    The presence and migration of PFAS in State natural resources and property, absent large-scale and costly remediation and/or treatment, will continue indefinitely and will continue to indefinitely threaten such natural resources and property.

351.    Because of the injury PFAS have caused and are causing to State natural resources, Defendants must remediate PFAS contamination and restore these natural resources, and the State is entitled to compensation for interim and permanent losses to its natural resources, as well as any costs it incurs in restoring its natural resources.

352.    The People reserve their right to amend this Complaint as additional evidence of PFAS contamination comes to light including, but not limited to, PFAS contamination of wildlife, aquatic life, waters, soils, sediments, and other State natural resources arising from/related to Defendants' pollution of the State's natural resources and PFAS contamination at and around the

CWSs identified above and additional location yet to be determined, as described herein.

## CLAIMS ALLEGED

### COUNT I
### NEGLIGENCE
### (Against All Defendants)

353. The People repeat, re-allege, and incorporate by reference each and every allegation contained in paragraphs 1 through 352 above, as though fully set forth herein.

354. Defendants had a duty to the State to exercise due care in designing, manufacturing, marketing, distributing, promoting, selling, testing, labeling, warning, and instructing on the use and disposal of PFAS, waste containing PFAS, and products containing PFAS.

355. Defendants breached their duty of care in that they negligently, carelessly, and/or recklessly acted or failed to act in designing, manufacturing, marketing, distributing, promoting, selling, testing, labeling, warning, and instructing on the use and disposal of PFAS, PFAS-containing products, and PFAS-containing waste that have been used and/or disposed of in the State in such a manner as to directly and proximately cause PFAS to contaminate the State's property and its surface waters, groundwater, drinking water, wetlands, fish, wildlife, aquatic life, marine resources, soil, sediment, air, and other natural resources, thereby causing a threat to human health and the environment, despite their years-long knowledge that PFAS chemicals persist in the environment and are harmful to human health and the environment.

356. Defendants further were grossly negligent because they failed to exercise even slight care, placing revenue and profit generation above human and environmental health and safety.

60

357. Defendants' conduct was wanton, willful, and showed a reckless disregard or conscious indifference for the rights and safety of the State and its residents.

358. As a direct and proximate result of Defendants' acts and omissions as alleged herein, the State has suffered monetary losses and damages in amounts to be proven at trial.

WHEREFORE, Plaintiff, PEOPLE OF THE STATE OF ILLINOIS, respectfully requests that this Court enter an Order:

(a) finding that Defendants' actions alleged herein constituted, and continue to constitute, a negligent act;

(b) holding Defendants jointly and severally liable for all past and future natural resource damages, loss-of-use damages, response activity costs, costs of investigation, costs of testing and monitoring, costs of providing water from an alternate source, costs of installing and maintaining an early warning system to detect PFAS before it reaches wells, costs of restoring natural resources contaminated by PFAS including groundwater, surface waters, soils, sediments, and other natural resources, where appropriate, costs of remediating PFAS contamination at and around the CWSs identified above and additional locations yet to be determined, where appropriate, any other costs or other expenditures incurred to address PFAS contamination and injury at and around the CWSs identified above and additional locations yet to be determined, interest on the damages according to law, and any other relief necessary to remedy PFAS contamination at and around the CWSs identified above and additional locations yet to be determined;

(c) ordering the Defendants to immediately undertake the necessary action that will result in a final and permanent abatement of the damage caused by its negligent acts; and

(d) granting such other and further relief as this Court deems appropriate and just.

## COUNT II
## TRESPASS
### (Against All Defendants)

359.    The People repeat, re-allege, and incorporate by reference each and every allegation contained in paragraphs 1 through 352 above, as though fully set forth herein.

360.    Defendants knew with substantial certainty that their acts and omissions would contaminate the State's property and its surface waters, groundwater, drinking water, wetlands, wildlife, aquatic life, marine resources, soil, sediment, air, and other natural resources with PFAS manufactured by Defendants.

361.    The PFAS manufactured by Defendants contaminated the State's property and its surface waters, groundwater, drinking water, wetlands, fish, wildlife, marine resources, soil, sediment, air, and other natural resources and constitutes an unauthorized direct and immediate physical intrusion of property of which the State is a trustee.

362.    The trespass of PFAS alleged herein has varied over time and has not ceased.

363.    PFAS manufactured, marketed, distributed, sold, released, disposed of, handled, supplied, transported, and/or used by the Defendants continues to be located on or in the State's property and its surface water, groundwater, drinking water, wetlands, wildlife, aquatic life, marine resources, soil, sediment, and other natural resources.

364.    Defendants are liable for trespass.

365.    The State has not consented to and does not consent to the trespass alleged herein.

366.    The State has significant property rights and interests in the natural resources of the State, including, without limitation, the State's public trust and *parens patriae* interests and authority.

367.    The ownership of and title to all wild birds and wild mammals within the jurisdiction of the State of Illinois are declared to be in the State of Illinois.  520 ILCS 5/2.1 (2020).

368.    The ownership of and title to all aquatic life within the boundaries of the State of Illinois are declared to be in the State of Illinois.  515 ILCS 5/5-5 (2020).

369.    As trustee of the State's natural resources, the State is authorized to take action to protect those natural resources as if the State is the owner of the property on which those natural resources are located.

370.    The State has a duty to protect, enhance, and restore the environment, its natural resources and to protect the health and welfare of its inhabitants.

371.    The State has *parens patriae* power to represent the interests of the People to protect, enhance, and restore the environment, its natural resources and to protect the health and welfare of its inhabitants.

372.    Accordingly, the State is bringing this action for the invasion of its exclusive possessory interests in the State's natural resources, in addition to its residents' interest in the integrity of the State's natural resources.

373.    As long as the State's property and natural resources remain contaminated due to Defendants' conduct, the trespass continues.

374.    As a direct and proximate result of the Defendants' acts and omissions as alleged herein, the State and its residents have suffered monetary losses and damages in an amount to be proven at trial.

WHEREFORE, Plaintiff, PEOPLE OF THE STATE OF ILLINOIS, respectfully requests that this Court enter an Order:

(a)  finding that Defendants' actions alleged herein constituted, and continue to constitute, a trespass;

(b)  holding Defendants jointly and severally liable for all past and future natural resource damages, loss-of-use damages, response activity costs, costs of investigation, costs of testing and monitoring, costs of providing water from an alternate source, costs of installing and maintaining an early warning system to detect PFAS before it reaches wells, costs of restoring natural resources contaminated by PFAS including groundwater, surface waters, soils, sediments, and other natural resources, where appropriate, costs of remediating PFAS contamination at and around the CWSs identified above and additional locations yet to be determined, where appropriate, any other costs or other expenditures incurred to address PFAS contamination and injury at and around the CWSs identified above and additional locations yet to be determined, interest on the damages according to law, and any other relief necessary to remedy PFAS contamination at and around the CWSs identified above and additional locations yet to be determined;

(c)  ordering the Defendants to immediately undertake the necessary action that will result in a final and permanent abatement of the trespass; and

(d)  granting such other and further relief as this Court deems appropriate and just.

## COUNT III
## PUBLIC NUISANCE
### (Against All Defendants)

375.  The People repeat, re-allege, and incorporate by reference each and every allegation contained in paragraphs 1 through 352 above, as though fully set forth herein.

376.  The Illinois Constitution provides the People of the State of Illinois a common right to a healthful environment.  ILL. CONST. ARTICLE XI, § 1 (1970).

377.    Defendant, by its actions, caused an unreasonable and substantial interference with the public health and welfare and the environment and has obstructed the public's free use and comfortable enjoyment of Illinois' natural resources for commerce, navigation, fishing, recreation, and aesthetic enjoyment.  To wit, by its conduct, alleged herein, Defendants have, through their actions, manufactured and caused the disposal of PFAS in a way that has caused the pollution of the surface waters, groundwater, drinking water, wetlands, fish, wildlife, marine resources, soil, sediment, air, and other natural resources that are relied upon and surround the CWSs identified above and additional locations yet to be determined.

378.    An ordinary person would be reasonably annoyed or disturbed by the presence of PFAS that endanger the health of fish, animals, and humans and degrade surface waters, groundwater, drinking water, wetlands, fish, wildlife, marine resources, soil, sediment, air, and other natural resources.

379.    As a consequence of its actions, as alleged herein, Defendants have created and maintained, and continue to create and maintain, a public nuisance at common law.

380.    Defendants' conduct caused and continues to cause harm to the State and its residents.

381.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, the State has suffered monetary losses and damages in amounts to be proven at trial.

WHEREFORE, Plaintiff, PEOPLE OF THE STATE OF ILLINOIS, respectfully requests that this Court enter an Order:

(a) finding that the Defendants' actions alleged herein constituted a common law public nuisance;

(b) holding Defendants jointly and severally liable for all past and future natural resource damages, loss-of-use damages, response activity costs, costs of investigation, costs of testing and monitoring, costs of providing water from an alternate source, costs of installing and maintaining an early warning system to detect PFAS before it reaches wells, costs of restoring natural resources contaminated by PFAS including groundwater, surface waters, soils, sediments, and other natural resources, where appropriate, costs of remediating PFAS contamination at and around the CWSs identified above and additional locations yet to be determined, where appropriate, any other costs or other expenditures incurred to address PFAS contamination and injury at and around the CWSs identified above and additional locations yet to be determined, interest on the damages according to law, and any other relief necessary to remedy PFAS contamination at and around the CWSs identified above and additional locations yet to be determined;

(c) enjoining Defendants from further acts constituting a common law public nuisance;

(d) ordering Defendants to immediately undertake the necessary action that will result in a final and permanent abatement of the common law public nuisance; and

(e) granting such other and further relief as this Court deems appropriate and just.

## COUNT IV
## STRICT PRODUCTS LIABILITY – FAILURE TO WARN
### (Against All Defendants)

382. The People repeat, re-allege, and incorporate by reference each and every allegation contained in paragraphs 1 through 352 above, as though fully set forth herein.

383. Defendants were engaged in the business of testing, developing, designing, researching, formulating, manufacturing, distributing, promoting, marketing, and selling PFAS and products containing PFAS.

384. As formulators, manufacturers, distributors, marketers, promoters, and/or sellers of PFAS, as defined herein, Defendants had a duty to warn the State of Illinois, the public, public officials, consumers, and users of PFAS products of the environmental and health risks posed by PFAS.

385. PFAS and products containing PFAS manufactured and supplied by the Defendants are defective and unreasonably dangerous products and pose significant risks to human health and the environment.

386. At all times relevant to this action, Defendants' PFAS and products containing PFAS were used and disposed of in a manner in which they were reasonably foreseeably intended to be used.

387. Defendants' PFAS and products containing PFAS were distributed and sold in the manner intended or reasonably foreseeable by the Defendants or should have been reasonably foreseeable by Defendants.

388. Defendants' PFAS and products containing PFAS reached consumers and the environment in a condition substantially unchanged from that in which they left the Defendants' control.

389. Defendants' PFAS and products containing PFAS were not reasonably safe at the time they left Defendants' control because they lacked adequate warnings and instructions.

390. Without adequate warnings or instructions, Defendants' PFAS and products containing PFAS were unsafe to an extent beyond that which would be contemplated by an ordinary person.

391. Defendants knew that by failing to warn the State of Illinois, the public, public officials, consumers, and users of PFAS and products containing PFAS of the risks posed by

PFAS, their PFAS and products containing PFAS would be purchased, transported, stored, handled, used, and disposed of without users and consumers being aware of the hazards that PFAS pose to human health and the environment.

392. At the time of manufacture, Defendants could have provided warnings or instructions regarding the full and complete risks of their PFAS and products containing PFAS because they knew, and should have known, of the unreasonable risks of harm associated with the use, exposure to, and/or disposal of these products.

393. Despite this knowledge, Defendants represented, asserted, claimed, and warranted that their PFAS and products containing PFAS were safe for their intended and foreseeable uses and disposal, and did not require any different or special handling or precautions.

394. Defendants could have warned the public about the risks of their PFAS and PFAS containing products, but failed to do so and intentionally concealed information to maximize their profits.

395. Defendants knew, or should have known, that use of their PFAS and products containing PFAS would result in the discharge, disposal, emission, release, or spillage of PFAS, as defined herein, into the surface water, wetlands, groundwater, soil, and sediments of the State of Illinois.

396. Defendants breached their duty to warn by unreasonably failing to provide the State of Illinois, the public, public officials, consumers, and users of PFAS and products containing PFAS with warnings regarding the potential and/or actual threat to human health and the

environment caused by PFAS, despite Defendants' vast amount of knowledge and research demonstrating that PFAS presented threats to human health and the environment.

397.    At all times relevant to this litigation, Defendants had either actual or constructive knowledge that their PFAS and products containing PFAS were hazardous to the State of Illinois' natural resources and property, including knowledge that: (i) PFAS are released into the environment through the normal and foreseeable manufacture of products containing PFAS, use of PFAS in manufacturing processes, and disposal of PFAS waste; (ii) when released into the environment, PFAS persist over long periods of time and are resistant to biodegradation and bioremediation; (iii) PFAS bioaccumulate in humans and wildlife; (iv) PFAS can move and migrate great distances in both surface water and groundwater; and (v) PFAS pose significant risks to human health and the environment, even at very low levels.

398.    Plaintiff could not have reasonably discovered the defects and risks associated with Defendants' PFAS and products containing PFAS before or at the time the PFAS and products containing PFAS were released into the environment into the State of Illinois, absent sufficient warnings.

399.    As a result of the Defendants failure to warn about the unreasonably dangerous conditions of their PFAS and products containing PFAS, Defendants are strictly liable to Plaintiff.

400.    As a direct and proximate result of the Defendants failure to warn about the unreasonably dangerous conditions of the PFAS and products containing PFAS, the State of Illinois has incurred and will continue to incur costs and damages related to contamination of the State's property and its surface waters, groundwater, drinking water, wetlands, fish, wildlife, aquatic life, marine resources, soil, sediment, air, and other natural resources, thereby causing a threat to human health and the environment.

401.   As a direct and proximate result of Defendants' acts and omissions as alleged herein, the State and its residents have suffered monetary losses and damages in amounts to be proven at trial.

WHEREFORE, Plaintiff, PEOPLE OF THE STATE OF ILLINOIS, respectfully requests that this Court enter an Order:

(a) finding that Defendants failed to warn Plaintiff about the unreasonably dangerous conditions of the PFAS and products containing PFAS;

(b) holding Defendants jointly and severally liable for all past and future natural resource damages, loss-of-use damages, response activity costs, costs of investigation, costs of testing and monitoring, costs of providing water from an alternate source, costs of installing and maintaining an early warning system to detect PFAS before it reaches wells, costs of restoring natural resources contaminated by PFAS including groundwater, surface waters, soils, sediments, and other natural resources, where appropriate, costs of remediating PFAS contamination at and around the CWSs identified above and additional locations yet to be determined, where appropriate, any other costs or other expenditures incurred to address PFAS contamination and injury at and around the CWSs identified above and additional locations yet to be determined, interest on the damages according to law, and any other relief necessary to remedy PFAS contamination at and around the CWSs identified above and additional locations yet to be determined;

(c) ordering the Defendants to immediately undertake the necessary action that will result in a final and permanent abatement of the damage caused by its negligent acts; and

(d) granting such other and further relief as this Court deems appropriate and just.

## COUNT V
## STRICT PRODUCTS LIABILITY – DESIGN DEFECT
### (Against All Defendants)

402.    The People repeat, re-allege, and incorporate by reference each and every allegation contained in paragraphs 1 through 352 above, as though fully set forth herein.

403.    Defendants were engaged in the business of testing, developing, designing, researching, formulating, manufacturing, distributing, promoting, marketing, and selling PFAS and products containing PFAS.

404.    As formulators, manufacturers, distributors, marketers, promotors, and/or sellers of PFAS and products containing PFAS, Defendants owed a duty to all persons whom Defendants' PFAS and products containing PFAS might foreseeably harm, including the State of Illinois and its citizens, not to market any product which is unreasonably dangerous for its intended and foreseeable uses.

405.    Defendants represented, asserted, claimed, and warranted that their PFAS and products containing PFAS were safe for their intended and foreseeable uses.

406.    At all times relevant to this action, Defendants' PFAS and products containing PFAS were used and disposed of in a manner in which they were reasonably foreseeably intended to be used.

407.    Defendants' PFAS and products containing PFAS were distributed and sold in the manner intended or reasonably foreseeable by the Defendants or should have been reasonably foreseeable by Defendants.

408.    Defendants' PFAS and products containing PFAS were not reasonably safe as designed at the time they left Defendants' control.

409.    Defendants' PFAS and products containing PFAS reached consumers and the environment in a condition substantially unchanged from that in which they left the Defendants' control.

410.    Defendants knew, or should have known, that use of their PFAS and products containing PFAS would result in the discharge, disposal, emission, release, or spillage of PFAS, as defined herein, into the surface water, wetlands, groundwater, soil, and sediments of the State of Illinois.

411.    When Defendants placed their PFAS and products containing PFAS into the stream of commerce in the State of Illinois, they were defective in design, unreasonably dangerous, and not reasonably suited for their intended, foreseeable, and ordinary storage, handling, and uses because: (i) PFAS are released into the environment through the normal and foreseeable manufacture of products containing PFAS, use of PFAS in manufacturing processes, and disposal of PFAS waste; (ii) when released into the environment, PFAS persist over long periods of time and are resistant to biodegradation and bioremediation; (iii) PFAS bioaccumulate in humans and wildlife; (iv) PFAS can move and migrate great distances in both surface water and groundwater; and (v) PFAS pose significant risks to human health and the environment, even at very low levels.

412.    Defendants failed to inform manufacturers, users, consumers, intermediaries, the State of Illinois, and any party that could have effectively reduced the risk of harm related to using PFAS and products containing PFAS of the products' character and the care required to use and dispose of the product safely.

413.    The harm caused by Defendants' PFAS and products containing PFAS far outweighed their benefits, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate.

72

414.    The seriousness of the environmental and human health risk posed by Defendants'
PFAS and products containing PFAS far outweighs any purported social utility of Defendants'
conduct in manufacturing their PFAS and products containing PFAS and concealing the dangers
posed to human health and the environment.

415.    Plaintiff could not have reasonably discovered the defects and risks associated with
Defendants' PFAS and products containing PFAS before or at the time the PFAS and products
containing PFAS were released into the environment into the State of Illinois.  In fact, Defendants
intentionally hid this critical information from the public.

416.    At all relevant times, Defendants knew or should have known about the availability
and/or possibility that there were reasonably safer and feasible alternatives to using their PFAS
and products containing PFAS.

417.    Notwithstanding, Defendants continued to manufacture, market, distribute,
promote, and sell PFAS and products containing PFAS despite such knowledge to maximize their
profits and despite the foreseeable and known harms.

418.    As a result of the unreasonably dangerous conditions of the PFAS and products
containing PFAS, Defendants are strictly liable to Plaintiff.

419.    As a direct and proximate result, the State of Illinois has incurred and will continue
to incur costs and damages related to contamination of the State's property and its surface waters,
groundwater, drinking water, wetlands, fish, wildlife, aquatic life, marine resources, soil, sediment,
air, and other natural resources, thereby causing a threat to human health and the environment.

420.    As a direct and proximate result of Defendants' acts and omissions as alleged
herein, the State and its residents have suffered monetary losses and damages in amounts to be
proven at trial.

421.    WHEREFORE, Plaintiff, PEOPLE OF THE STATE OF ILLINOIS, respectfully requests that this Court enter an Order:

(a) finding that Defendants' PFAS and products containing PFAS were defectively designed;

(b) holding Defendants jointly and severally liable for all past and future natural resource damages, loss-of-use damages, response activity costs, costs of investigation, costs of testing and monitoring, costs of providing water from an alternate source, costs of installing and maintaining an early warning system to detect PFAS before it reaches wells, costs of restoring natural resources contaminated by PFAS including groundwater, surface waters, soils, sediments, and other natural resources, where appropriate, costs of remediating PFAS contamination at and around the CWSs identified above and additional locations yet to be determined, where appropriate, any other costs or other expenditures incurred to address PFAS contamination and injury at and around the CWSs identified above and additional locations yet to be determined, interest on the damages according to law, and any other relief necessary to remedy PFAS contamination at and around the CWSs identified above and additional locations yet to be determined;

(c) ordering the Defendants to immediately undertake the necessary action that will result in a final and permanent abatement of the damage caused by its negligent acts; and

(d) granting such other and further relief as this Court deems appropriate and just.

**COUNT VI**
**CIVIL CONSPIRACY**
**(Against All Defendants)**

422.     The People repeat, re-allege, and incorporate by reference each and every allegation

contained in paragraphs 1 through 352 above, as though fully set forth herein.

423.     As alleged herein, Defendants entered into agreements and organized groups, such

as the FluoroCouncil, to promote the interests of the world's leading manufacturers of

fluorotechnology products.

424.     In furtherance of the agreements and organized groups entered into by various

Defendants, Defendants committed the tortious acts described in the Seventh, Eighth, Tenth,

Eleventh, and Twelfth Causes of Action set forth herein.

425.     By participating in agreements and organized groups, such as the FluoroCouncil,

Defendants planned, assisted, or encouraged the tortious acts described in the Seventh, Eighth,

Tenth, Eleventh, and Twelfth Causes of Action set forth herein.

426.     Defendants, through agreements and organized groups, such as the FluoroCouncil,

engaged in a civil conspiracy and are responsible for damages caused by PFAS contamination

discovered in the State's property and its surface waters, groundwater, drinking water, wetlands,

fish, wildlife, aquatic life, marine resources, soil, sediment, air, and other natural resources, which

has caused and continues to cause a threat to human health and the environment.

427.     As a result of Defendants' civil conspiracy, the State and its residents have suffered

monetary losses and damages in amounts to be proven at trial.

WHEREFORE, Plaintiff, PEOPLE OF THE STATE OF ILLINOIS, respectfully requests

that this Court enter an Order:

(a) finding that Defendants' actions alleged herein constituted, and continue to constitute, a civil conspiracy to commit tortious acts;

(b) holding Defendants jointly and severally liable for all past and future natural resource damages, loss-of-use damages, response activity costs, costs of investigation, costs of testing and monitoring, costs of providing water from an alternate source, costs of installing and maintaining an early warning system to detect PFAS before it reaches wells, costs of restoring natural resources contaminated by PFAS including groundwater, surface waters, soils, sediments, and other natural resources, where appropriate, costs of remediating PFAS contamination at and around the CWSs identified above and additional locations yet to be determined, where appropriate, any other costs or other expenditures incurred to address PFAS contamination and injury at and around the CWSs identified above and additional locations yet to be determined, interest on the damages according to law, and any other relief necessary to remedy PFAS contamination at and around the CWSs identified above and additional locations yet to be determined;

(c) ordering the Defendants to immediately undertake the necessary action that will result in a final and permanent abatement of the damage caused by their civil conspiracy to commit tortious acts; and

(d) granting such other and further relief as this Court deems appropriate and just.

### <u>COUNT VII</u>
### COMMON LAW PROHIBITION ON UNJUST ENRICHMENT
### (Against All Defendants)

428. The People repeat, re-allege, and incorporate by reference each and every allegation contained in paragraphs 1 through 352 above, as though fully set forth herein.

429. Defendants have knowingly and unjustly retained a benefit to the State of Illinois's detriment.

430. Defendants' retention of the benefit violates the fundamental principles of justice, equity, and good conscience.

431. By continuing to manufacture, market, distribute, sell, handle, supply, transport, and/or use PFAS and PFAS containing products in a manner that has resulted in the release and disposal of PFAS and PFAS contaminated water and waste, even though the Defendants were aware that PFAS are hazardous to human health and the environment, Defendants have unjustly enriched themselves at the State's expense.

432. Because of Defendants' failure to make the People of Illinois, manufacturers, users, consumers, intermediaries, and any party that could have effectively reduced the risk of harm related to using PFAS and products containing PFAS aware of the harmful nature of PFAS, and Defendants' manufacturing, marketing, distributing, selling, handling, supplying, transporting, and/or using PFAS and PFAS-containing products in a manner that has resulted in the release and disposal of PFAS and PFAS-contaminated water, waste, and air emissions Defendants obtained enrichment they would not have otherwise obtained.

433. Defendants' enrichment was without justification and the State lacks a remedy provided by law.

434. Unjust enrichment arises not only where an expenditure by one party adds to the property of another, but also where the expenditure saves the other from expense or loss.

435. To address PFAS contamination in the State of Illinois to protect its residents, environment, and natural resources, the State has incurred, and continues to incur, substantial costs in investigating and responding to PFAS contamination at and around the CWSs identified above and additional locations yet to be determined.

77

436. Defendants have received a benefit from the State's response activities because Defendants should bear the cost of investigating and cleaning up the PFAS contamination caused by or related to the manufacturing, marketing, distributing, selling, handling, supplying, transporting, and/or using PFAS and PFAS containing products in a manner that has resulted in the release and disposal of PFAS and PFAS contaminated water and waste into and around the CWSs identified above and additional locations yet to be determined.

437. Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort that the State would reasonably expect to occur and is not part of the normal and expected costs of the State's existence. The State alleges wrongful acts which are neither discrete nor of the sort that can reasonably be expected.

438. The State has incurred expenditures for relief over and above the State's ordinary services.

439. The principles of justice and established common law require Defendants to reimburse the State for performing a duty properly owed by Defendants as a result of its conduct, as alleged herein.

WHEREFORE, Plaintiff, PEOPLE OF THE STATE OF ILLINOIS, respectfully requests that this Court enter an Order:

(a) finding that Defendants were unjustly enriched through the sale of PFAS and PFAS containing products;

(b) awarding compensatory damages in an amount sufficient to fairly and completely compensate the State for all damages;

(c) awarding disgorgement or compensation for Defendants' unjust enrichment of profits which directly result from the wrongful acts described above;

(d) entering a declaratory judgment requiring Defendants to abate the statutory violations alleged above, trespass, and public nuisance caused by the PFAS contamination; and

(e) granting such other and further relief as this Court deems appropriate and just.

## COUNT VIII
## RESTORATION OF AQUATIC LIFE AND WILDLIFE
## UNDER THE FISH AND WILDLIFE CODES
### (Against All Defendants)

440. The People repeat, re-allege, and incorporate by reference each and every allegation contained in paragraphs 1 through 352 above, as though fully set forth herein.

441. The ownership of and title to all wild birds and wild mammals within the jurisdiction of the State of Illinois are declared to be in the State of Illinois. 520 ILCS 5/2.1 (2020).

442. The ownership of and title to all aquatic life within the boundaries of the State of Illinois are declared to be in the State of Illinois. 515 ILCS 5/5-5 (2020).

443. Section 1-130 of the Fish Code, 515 ILCS 5/1-130 (2020), provides as follows:

Cooperation with EPA. The Department is authorized to cooperate with the Environmental Protection Agency of the State of Illinois in making pollution investigations and reports of pollution investigations.

444. Section 1.5 of the Wildlife Code, 520 ILCS 5/1.5 (2020) provides as follows:

The Department is authorized to cooperate with the Environmental Protection Agency of the State of Illinois in making pollution investigations and making reports thereof.

445. Section 1.50 of the Fish Code, 515 ILCS 5/1-150 (2020), provides, in pertinent part, as follows:

Preservation of aquatic life; actions to enforce Code. The Department shall take all measures necessary for the conservation, distribution, introduction, and restoration of aquatic life. * * * The Department shall also bring or cause to be brought actions and proceedings, in the name and by the authority of the People of the State of

Illinois, to enforce this Code, including administrative rules, and to recover any and all fines and penalties provided for. * * *

446.     Section 1.20 of the Fish Code, 515 ILCS 5/1-20 (2020), provides in pertinent part,

the following definition:

"Aquatic life" means all fish, mollusks, crustaceans, algae, aquatic plants, aquatic invertebrates, and any other aquatic animals or plants that the Department identifies in rules adopted after consultation with biologists, zoologists, or other wildlife experts. * * *

447.     Section 5-5 of the Fish Code, 515 ILCS 5/5-5 (2020), provides, in pertinent part, as

follows:

If any person causes any waste, sewage, thermal effluent, or any other pollutant to enter into, or causes or allows pollution of, any waters of this State so as to kill aquatic life, the Department, through the Attorney General, may bring an action against that person and recover the value of and the related costs in determining the value of the aquatic life destroyed by the waste, sewage, thermal effluent, or pollution. Any money so recovered shall be placed into the Wildlife and Fish Fund in the State Treasury.

448.     Section 1-70 of the Fish Code, 515 ILCS 5/1-70 (2020), provides the following

definition:

"Person" includes the plural "persons", females as well as males, and shall extend and be applied to clubs, associations, corporations, firms, and partnerships as well as individuals.

449.     Each Defendant is a "person" as that term is defined in Section 1-70 of the Code,

515 ILCS 5/1-70 (2020).

450.     Section 1.10 of the Wildlife Code, 520 ILCS 5/1-10 (2020), provides, in pertinent

part, as follows:

The Department shall take all measures necessary for the conservation, distribution, introduction and restoration or birds and mammals. The Department also shall bring or cause to be brought, actions and proceedings, in the name, and by the authority, of the People of the State of Illinois, to enforce the provisions of this Act,

80

including administrative rules, and to recover any and all fines and penalties hereinafter provided for. * * *

451. Defendants, as described above, had control of the research and information concerning the hazardous nature of the PFAS compounds they manufactured, and the care required to use and dispose of the products safely.

452. Defendants, as described above, had control of the information and whether to pass instructions on the proper storage, use, and handling of the PFAS products they manufactured to manufacturers, users, consumers, intermediaries, and any party that could have effectively reduced the risk of harm related to using PFAS and products containing PFAS.

453. Defendants knew that failing to provide instructions on the proper storage, use, and handling of the PFAS products they manufactured, to the manufacturers, users, consumers, and intermediaries, would cause or allow the release of PFAS from Defendants' PFAS products into waters of the State.

454. Defendants, through their acts and omissions as described above, and by failing to provide information to these manufacturers, users, consumers, and intermediaries, despite Defendants' knowledge of the intended use and disposal of their PFAS products, caused or allowed the release of PFAS from locations at and around surface waters relied upon by the CWSs identified above and additional locations yet to be determined and adversely affected the aquatic life, wildlife, habitat, and natural resources at and around surface waters relied upon by the CWSs identified above and additional locations yet to be determined.

455. By causing or allowing the release of PFAS from locations at and around surface waters relied upon by the CWSs identified above and additional locations yet to be determined, Defendants adversely affected the aquatic life in waters that constitute, can impact, and can be

81

impacted by surface waters relied upon by the CWSs identified above and additional locations yet to be determined by reducing food supplies, lowering water quality, leaving the remaining aquatic life population less able to respond to adverse conditions, and reducing the breeding population.

456.    By causing or allowing the release of PFAS from locations at and around surface waters relied upon by the CWSs identified above and additional locations yet to be determined, Defendants caused the death of aquatic life in waters that constitute, can impact, and can be impacted by surface waters relied upon by the CWSs identified above and additional locations yet to be determined and is liable for the value of the aquatic life lost and the related costs in determining the value of the aquatic life destroyed by the release of PFAS pursuant to Section 5-5 of the Fish Code, 515 ILCS 5/5-5 (2020).

457.    As a result of their conduct as alleged herein, Defendants are thus liable for the value of the adverse impact on aquatic life and the related costs in determining the value of the aquatic life adversely impacted by the released of PFAS, pursuant to Section 5-5 of the Fish Code, 515 ILCS 5/5-5 (2020).

458.    Pursuant to Section 1-150 of the Fish Code, 515 ILCS 5/1-150 (2020), and Section 1.10 of the Wildlife Code, 520 ILCS 5/1-10 (2020), Defendants are also liable for the restoration of the aquatic life in and the wildlife dependent upon the waters that constitute, can impact, and can be impacted by surface waters relied upon by the CWSs identified above and additional locations yet to be determined.

WHEREFORE, Plaintiff, PEOPLE OF THE STATE OF ILLINOIS, respectfully requests that this Court enter an Order:

(a) finding that Defendants have caused the death and destruction of aquatic life in waters that constitute, can impact, and can be impacted by the CWSs identified above and additional

82

locations yet to be determined, have adversely affected the aquatic life present in waters that constitute, can impact, and can be impacted by the CWSs identified above and additional locations yet to be determined, and have adversely affected the wildlife dependent upon the waters that constitute, can impact, and can be impacted by the CWSs identified above and additional locations yet to be determined;

(b) ordering the Defendants to pay the Illinois Department of Natural Resources to conduct an assessment of injury and damage determination relative to restoring the aquatic life, wildlife, habitat, and other natural resources lost or destroyed at and around surface waters relied upon by the CWSs identified above and additional locations yet to be determined, and to compensate the Illinois Department of Natural Resources for injury and damage to aquatic life, wildlife, habitat, and other natural resources lost or destroyed in the Mississippi River System at and around the CWSs identified above and additional locations yet to be determined pursuant to Section 1-150 of the Fish Code, 515 ILCS 5/1-150 (2020), and Section 1-10 of the Wildlife Code, 520 ILCS 5/1-10 (2020); and

(c) granting such other relief as this court deems appropriate and just.

## <u>COUNT IX</u>
### VIOLATION OF THE ILLINOIS CONSUMER FRAUD
### AND DECEPTIVE BUSINESS PRACTICES ACT
### (Against All Defendants)

459. The People repeat, re-allege, and incorporate by reference each and every allegation contained in paragraphs 1 through 352 above, as though fully set forth herein.

460. While engaged in trade or commerce, the Defendants have committed unfair and/or deceptive acts or practices, with the intent that others rely on the deceptive acts and practices, declared unlawful under Section 2 of the Consumer Fraud and Deceptive Business

83

Practices Act, 815 ILCS 505/2, by engaging in and employing the acts and practices alleged herein, including:

(a) Failing to disclose to users and consumers the material facts that the use and disposal of PFAS are associated with known environmental and health risks such as liver damage, altered cholesterol levels, pregnancy-induced hypertension and/or preeclampsia, thyroid disease, modulation of the immune system, decreased fertility, decreases in birth weight, and cancer.

(b) Misrepresenting, directly or by implication, that PFAS that they designed, developed, manufactured, marketed, distributed, sold, and/or supplied was safe and did not create any environmental or health risks.

461.     Each and every unfair or deceptive act or practice engaged in by Defendants, as recited above, constitutes a separate violation of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*

462.     Defendants persistently and knowingly committed the unfair and deceptive acts and practices alleged herein.

WHEREFORE, Plaintiff, PEOPLE OF THE STATE OF ILLINOIS, respectfully requests that this Court enter an Order:

(a)  Finding that Defendants have violated Section 2 of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2, by the unlawful acts and practices alleged herein;

(b)  Preliminarily and permanently enjoining the Defendants, their agents, employees, and all other persons and entities, corporate or otherwise, in active concert or participation with any of them, from engaging in the deceptive and unfair acts and practices alleged herein;

(c) Requiring full restitution be made to all Illinois consumers impacted by Defendants deceptive and unfair acts and practices, including for all PFAS that Defendants designed, developed, manufactured, marketed, distributed, sold, and/or supplied;

(d) Assessing a civil penalty of up to $50,000 per deceptive or unfair act or practice and an additional amount of $50,000 for each act or practice found to have been committed with intent to defraud, as provided in Section 7 of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/7;

(e) Ordering Defendants to pay all costs for the prosecution and investigation of this action, as provided by 815 ILCS 505/10; and

(f) Granting such other and further relief as the Court deems equitable and proper.

## COUNT X
### VIOLATION OF THE ILLINOIS UNIFORM FRAUDULENT TRANSFER ACT
### (Against Defendants Historical DuPont; Corteva, Inc.;
### E.I. DuPont de Nemours, Inc., and The Chemours Company)

463. The People repeat, re-allege, and incorporate by reference the allegations contained in Paragraphs 1 through 352, above, as though fully set forth herein.

464. Under the Illinois Uniform Fraudulent Transfer Act ("IUFTA"), 740 ILCS 160/5 (2020):

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

465.    The "IUFTA Defendants," *i.e.*, Historical DuPont, Corteva, Inc., E.I. DuPont de Nemours, Inc., and The Chemours Company, have: (a) acted with actual intent to hinder, delay, and defraud parties; and/or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (i) were engaged or were about to engage in a business for which the remaining assets of The Chemours Company were unreasonably small in relation to the business; or (ii) intended to incur, or believed or reasonably should have believed that The Chemours Company would incur, debts beyond its ability to pay as they became due.

466.    The IUFTA Defendants engaged in acts in furtherance of a scheme to transfer Historical DuPont's assets out of the reach of parties such as the State of Illinois that have been damaged as a result of the IUFTA Defendants' conduct, omissions, and actions described herein.

467.    It is primarily Historical DuPont, rather than The Chemours Company, that, for decades, manufactured, marketed, distributed, and/or sold PFAS and/or products containing PFAS with the superior knowledge that they were toxic, mobile, persistent, bio-accumulative, and biomagnifying, and through normal and foreseen use, would impact the State natural resources.

468.    As a result of the transfer of assets and liabilities described herein, the IUFTA Defendants have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from the manufacturing, marketing, distribution, and/or sale of PFAS and products containing PFAS.

469.    At the time of the transfer of its Performance Chemicals Business to The Chemours Company, Historical DuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacturing, marketing, distribution, and/or sale of PFAS and/or products containing PFAS.

86

470. The IUFTA Defendants acted without receiving a reasonably equivalent value in exchange for the transfer or obligation, and Historical DuPont believed or reasonably should have believed that The Chemours Company would incur debts beyond The Chemours Company's ability to pay as they became due.

471. At all times relevant to this action, the claims, judgments, and potential judgments against The Chemours Company potentially exceeded The Chemours Company's ability to pay.

472. Pursuant to 740 ILCS 160/8 (2020), the State seeks avoidance of any transfer of Historical DuPont liabilities for the claims brought in this Complaint and to hold the IUFTA Defendants liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint.

473. The State further seeks all other rights and remedies that may be available to it under the IUFTA, including prejudgment remedies as available under applicable law, as may be necessary to fully compensate the State for the damages and injuries it has suffered as alleged herein.

WHEREFORE, Plaintiff, PEOPLE OF THE STATE OF ILLINOIS, respectfully requests that this Court enter an Order:

(a) Allowing Plaintiff to avoid any transfer of Historical DuPont liabilities for the claims brought in this Complaint;

(b) Holding the IUFTA Defendants liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint; and

(c) Awarding all other rights and remedies that may be available to Plaintiff under the IUFTA, including prejudgment remedies as available under applicable law, as may be necessary

to fully compensate the People of the State of Illinois for the damages and injuries it has suffered as alleged herein.

## REQUEST FOR RELIEF

WHEREFORE, in addition to the relief requested in each individual Cause of Action listed above, Plaintiff, PEOPLE OF THE STATE OF ILLINOIS, seeks judgment in its favor and against Defendants for:

A. Compensatory damages arising from PFAS contamination and injury of State natural resources and property, including groundwater, surface waters, wetlands, drinking water supplies, biota, wildlife, aquatic life, and their associated soils, sediments, and uses, and other State natural resources and property, according to proof, including, but not limited to:

    a.    natural resource damages;

    b.    loss-of-use damages;

    c.    past and future response activity costs;

    d.    costs of investigation;

    e.    costs of testing and monitoring;

    f.    costs of providing water from an alternate source;

    g.    costs of installing and maintaining approved drinking water treatment systems;

    h.    costs of installing and maintaining an early warning system to detect PFAS before it reaches any drinking water intakes;

i.     costs of remediating PFAS from natural resources and restoration of these natural resources, including groundwater, surface waters, wetlands, soils, sediments, and other natural resources;

j.     remedial action at and around the CWSs identified herein and additional locations yet to be determined, including cleanup of PFAS contamination;

k.     any other costs or other expenditures incurred to address PFAS contamination and injury at and around the CWSs identified herein and additional locations yet to be determined; and

l.     interest on the damages according to law;

B.  Injunctive relief to address past, present, and future PFAS contamination by:

a.     ordering Defendants to implement a program of ongoing public outreach and information-sharing efforts to provide effective communication to the public and local units of government regarding the status and progress of response activities related to releases of PFAS into the environment;

b.     ordering Defendants to institute protective measures to prevent endangerment to human health and the environment including, but not limited to: (a) sampling for PFAS in drinking water using U.S. EPA-approved Method 537 version 1.1, as written, including any modifications allowed therein, or any subsequent U.S. EPA-approved method; (b) connection to municipal drinking water supplies that are free of PFAS contamination; and (c) provision and maintenance of drinking water treatment systems, including regular sampling;

c.     ordering Defendants to complete the investigation, characterization, and remediation of the PFAS released into the environment from its manufacturing

processes and disposal practices, including potential releases via air deposition, identify pathways of exposure to natural resources, restore natural resources that have been damaged or impacted by PFAS, and analyze the impact of such releases to drinking water wells, surface waters, stream biota, groundwater, soils, sediments, flora, and fauna, including sportfish and other wildlife consumed by the public, subject to the approval of the State;

C. Statutory penalties, fines, and any other relief available under the Illinois Consumer Fraud and Deceptive Business Practices Act;

D. Costs (including reasonable attorney fees, court costs, and other expenses of litigation);

E. Prejudgment interest; and

F. Any other and further relief as the Court deems just, proper, and equitable.

## JURY DEMAND

Plaintiff, People of the State of Illinois, *ex rel.* Kwame Raoul, Attorney General of the State of Illinois, demands a trial by jury on all claims herein so triable.

Dated: January 31, 2023

PEOPLE OF THE STATE OF ILLINOIS,
*ex rel.* KWAME RAOUL, Attorney General
of the State of Illinois

MATTHEW J. DUNN, Chief
Environmental Enforcement/Asbestos
Litigation Division

By: _____
Adam J. Levitt
One of their attorneys

90

Stephen J. Sylvester (ARDC No. 6282241)
Ellen F. O'Laughlin (ARDC No. 6193873)
Karen Howard (ARDC No. 6207358)
**OFFICE OF THE ILLINOIS ATTORNEY GENERAL**
Environmental Bureau
69 West Washington Street, Suite 1800
Chicago, Illinois 60602
(312) 814-2550
stephen.sylvester@ilag.gov
ellen.olaughlin@ilag.gov
karen.howard@ilag.gov

Adam J. Levitt (ARDC No. 6216422)
Daniel Rock Flynn (ARDC No. 6282876)
Amy E. Keller (ARDC No. 6296902)
Diandra Debrosse Zimmerman*
Anna Claire Skinner*
Special Assistant Attorneys General
Cassandra Hadwen (ARDC No. 6335978)
**DıCELLO LEVITT LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
(312) 214-7900
alevitt@dicellolevitt.com
dflynn@dicellolevitt.com
akeller@dicellolevitt.com
fu@dicellolevitt.com
askinner@dicellolevitt.com
chadwen@dicellolevitt.com

Gregory M. Utter*
Joseph M. Callow, Jr.*
Special Assistant Attorneys General
Sarah V. Geiger*
Collin L. Ryan*
Matthew M. Allen*
Joseph B. Womick*
**KEATING MUETHING & KLEKAMP PLL**
1 East 4th Street, Suite 1400
Cincinnati, Ohio 45202
(513) 579-6400
gmutter@kmklaw.com
jcallow@kmklaw.com
sgeiger@kmklaw.com
cryan@kmklaw.com

91

mallen@kmklaw.com
jwomick@kmklaw.com

Richard W. Fields*
Martin Cunniff*
Special Assistant Attorneys General
**FIELDS, HAN & CUNNIFF LLC**
1700 K Street NW, Suite 810
Washington, DC  20006
(833) 382-9816
fields@fhcfirm.com
martin.cunniff@fhcfirm.com

*Motions for admission pro hac vice to be filed*